### Henry Watkins SKINNER, Appellant,

### v.

### The STATE of Texas, Appellee.

#### No. 72131.

Court of Criminal Appeals of Texas.

May 21, 1997.

Rehearing Denied Sept. 10, 1997.

Steven C. Losch, Longview, for appellant.

John Mann, District Attorney, Pampa, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MEYERS, Judge.

Appellant was convicted of capital murder in March 1995. Tex.Penal Code Ann. § 19.03(a)(7)(A). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure art. 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death.[1] Article 37.071 § 2(g). Direct appeal is automatic. Article 37.071 § 2(h). We will affirm.

Appellant raises twenty-one points of error, including a challenge to the legal sufficiency of the evidence to support the conviction. We will address the points in the approximate order in which they are raised. Review of the facts in the light most favorable to the verdict is necessary.

Appellant lived with his girlfriend, Twila Busby, and her two mentally-retarded sons,[2] 22-year-old Elwin Caler and 20-year-old Randy Busby. Around 9:30 on the evening of December 31, 1993, Twila and appellant called a friend of Twila's, Howard Mitchell,[3] and told him they wanted to go to his New Year's party, but needed a ride there. Between 10:15 and 10:30 p.m., when Mitchell went to pick up the pair, he found appellant passed out on the couch and was unable to wake him. Apparently, appellant had been drinking.

Leaving appellant in his stupor, Twila and Mitchell went to Mitchell's trailer where a party was in progress. Twila was followed around at the party by her drunken uncle who made rude sexual advances toward her and generally agitated her until she asked Mitchell to take her home. Mitchell drove Twila home between 11:00 and 11:15 p.m., and left.

At midnight, Police Officer Fred Courtney was dispatched to investigate a stabbing at an address located across the alley from appellant's residence. He arrived to find Elwin Caler sitting on the porch of a neighbor's house with a blanket pressed against his side. Elwin had a mortal stab wound under his left arm and superficial wounds to his right hand and stomach. He was taken to the hospital where he died at 12:45 a.m..

Four blocks away, also at midnight, appellant knocked at the door of his former girlfriend, Andrea Reed. Reed asked appellant to leave, but he entered the house and told her that she had to help him because he had been stabbed and shot. Appellant's shirt and pants had a great deal of blood on them. Appellant removed his shirt, but Reed could find no injuries except for a bleeding cut in the palm of his right hand, which she agreed to suture.

Reed and appellant conversed for almost three hours during which time appellant made a series of inconsistent statements about the cause of and events surrounding his injury. At one point Reed attempted to leave the room to call the police, but appel-

---

1. All references to articles are to those in the Texas Code of Criminal Procedure in effect at the time of the offense unless otherwise indicated.

2. The boys were referred to as "mentally-retarded." However, their respective levels of functioning were not elaborated upon.

3. Appellant told Mitchell on a previous occasion that he loved Twila, but he would kill her if she was unfaithful to him.

lant stopped her and threatened to kill her. Reed told him she was going to call Twila to ask her what happened and appellant claimed that he caught Twila in bed with her ex-husband and fought with him. Eventually, appellant offered to tell Reed what really happened if she would promise not to reveal it to anyone. When Reed promised not to tell, appellant stated that he thought he had kicked Twila to death.

While appellant was at Reed's house, the police were investigating Elwin's stabbing. As they approached the house where Elwin lived with his mother, brother, and appellant, the police noticed a trail of blood spots on the ground running from the front porch to the fence line. There was a blood smear on the glass storm door and a knife on the front porch. Upon entering the residence, the police found Twila's dead body on the living room floor. It was later determined that she had been strangled into unconsciousness and subsequently beaten at least fourteen times about the face and head with a club. An ax handle stained with blood and hair was leaning against the couch near her body and a black plastic trash bag containing a knife and a towel with wet brownish stains on it was laying between the couch and the coffee table.

Officer Morse Burroughs proceeded to the bedroom where Elwin and Randy usually slept in bunk beds. He found Randy's dead body laying face down on the upper bunk, covered by a blood spotted blanket. Randy had been stabbed in the back three times. A door leading out of the bedroom and into a utility room yielded further evidence. Burroughs noticed a bloody handprint located about 24 inches off the floor on the frame of this door. He also noted a bloody handprint on the door knob of the door leading from the kitchen to the utility room and a handprint on the knob of the door exiting from the utility room into the backyard.

The police arrested appellant at Reed's house at approximately 3:00 a.m.. They found him standing in a closet wearing blood-stained socks and blood-stained blue jeans.

He appeared intoxicated. A toxicological test on a blood sample appellant voluntarily provided at 5:48 a.m. showed appellant to have 0.11 milligrams of codeine per liter of blood and a blood alcohol level of 0.11 percent. Tests on the blood on appellant's clothing was found to belong to Twila and Elwin. In a tape-recorded statement to the police, appellant claimed to remember little of what happened on the night of the murders after he fell asleep on the couch. Autopsy evidence showed all of the murders to have been committed in the same general time frame.

■ In his first point of error, appellant claims the evidence is legally insufficient to support the verdict that he killed *three* people during the same criminal transaction. Appellant concedes that the evidence is sufficient to prove that appellant killed both Twila and Elwin. He also concedes that appellant left the bloody handprints found in the house, including the one found on the frame of the door leading from Randy's bedroom into the utility room. However, appellant contends that it is simply not rational for a jury to conclude that appellant killed Randy in addition to killing Twila and Elwin because he had no motive and no further evidence connected him to Randy's murder. We disagree.

■ In reviewing the sufficiency of the evidence, this Court views all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The physical evidence connected appellant to the murders of two of the victims. Appellant also stated that he thought he had killed Twila. All three victims lived in the same house, and all three were apparently home with appellant around the time of the murders. No evidence other than appellant's own statement indicates that anyone else was in the residence during the time of the murders.[4] Also,

---

4. A handprint was found on the black plastic trash bag containing a knife. The handprint was determined not to belong to appellant. Howev-

er, no further testing or examination was conducted to determine who's handprint it was. It was rational for a juror to believe beyond a

a trail of blood spots ran from the front porch of the residence to the fence line and only one victim was found outside of the house. Given the totality of the evidence, it was rational for a juror to believe beyond a reasonable doubt that appellant killed all three of the victims during the same criminal transaction. *See Heiselbetz v. State,* 906 S.W.2d 500, 504 (Tex.Crim.App.1995); *Rios v. State,* 846 S.W.2d 310, 313 (Tex.Crim.App. 1992), *cert. denied,* 507 U.S. 1051, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993). Point of error one is overruled.

In points of error two through six appellant complains of the trial court's disclosure to the State of a document prepared by an expert for the defense. Appellant claims the document constituted privileged work product. The State contends the document was discoverable as underlying facts or data pursuant to Texas Rule of Criminal Evidence 705. The State also relies on *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), for the proposition that the work product privilege, if applicable, was waived.[5] In point of error two, appellant claims the disclosure violated Rule of Criminal Evidence 705; in point of error three, appellant claims the disclosure violated Rule of Criminal Evidence 614; in point of error four, appellant claims the disclosure violated the attorney-client privilege; in point of error five, appellant claims the disclosure violated the work product doctrine; in point of error six, appellant claims the disclosure violated appellant's due process rights. Because we find error on the basis of point of error five, we do not address the merits of points three, four and six. We address point of error two because the State claims the disclosure was authorized under Rule 705.

Pursuant to a motion by appellant, the trial court appointed Dr. William T. Lowry to serve as an expert for the defense. *See Ake*

*v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Lowry, a toxicology expert, testified that calculations based on the results of the toxicological tests performed by the Department of Public Safety demonstrated that appellant's blood alcohol level was .21 percent and he had .4 grams of codeine per liter of blood at the time of the murders. Lowry stated that the two intoxicants had a synergistic effect that drastically increased their potency. He further testified that the majority of people under the influence of those levels of intoxicants would be in a stuporous state.[6] Lowry opined that under the circumstances described, it was "highly improbable" that appellant would have been physically capable of committing the three murders in question.

On cross-examination, the State sought the production of documents that had been furnished to Lowry that served as "the bases of his opinions." Tex.R.Crim.Evid. 705. Defense counsel responded that Lowry had primarily been furnished the State's file, but could not say exactly what else he might have been provided. The State then urged the trial judge to conduct an *in camera* inspection of the defense file in order to produce "anything the Court finds that would not be work product or would not be privileged, that might indicate what documents [Lowry] has seen[.]" After conducting an *in camera* inspection, the judge identified a document he described as "some written comments and questions from [Lowry]" and asked the parties to research its disclosure. In a hearing on the matter, Lowry testified that after reviewing the State's file and prior to his initial meeting with defense counsel, he prepared the document entitled "Comments and Questions" (hereinafter "Exhibit 15(a)") for purposes of discussions with defense counsel. Lowry explained he prepared Ex-

---

reasonable doubt that this handprint belonged to one of the other three occupants of the house rather than to some hypothetical stranger.

5. While the State does not cite *Nobles* in its brief, at oral argument before the Court the State said the document was discoverable for two reasons: Rule 705 and the United States Supreme Court's opinion in *Nobles.*

6. Lowry described a stuporous state as:

Their general inertia would have been approaching somewhat of a paralysis state, have very marked muscular hand coordination, inability to stand or walk, have incontinence of urine, possibly incontinence of feces, impaired consciousness maybe going from conscious to unconscious state, depending upon the individual, maybe asleep or in a stupor state.

hibit 15(a) to serve as "a format for us [Lowry and defense counsel] to have our first discussion in order that [defense counsel] might provide me with additional information to have some factual basis to make an opinion."

Over appellant's objections, the trial judge compelled disclosure of Exhibit 15(a) to the State for purposes of its cross-examination of Lowry. A re-typed version of Exhibit 15(a) is attached as an Appendix.

## A. Work Product

■ The United States Supreme Court has described the work product doctrine as sheltering "[a]t its core ... the mental processes of the attorney, providing a privileged area within which [an attorney] can analyze and prepare his client's case." *Washington v. State,* 856 S.W.2d 184, 187 (Tex.Crim.App.1993)(quoting *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975)). The doctrine is a critical component of a properly functioning adversarial system:

Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly

though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947). In addition to materials prepared by the attorney, the doctrine also protects the work product of "an agent for an attorney":

[T]he [work-product] doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared for the attorney as well as those prepared by the attorney himself.

*Washington,* 856 S.W.2d at 187 (quoting *Nobles* ). An expert appointed pursuant to *Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985), is an agent of defense counsel for purposes of the work product doctrine. *Taylor v. State,* 939 S.W.2d 148 (Tex.Crim.App.1996).

■ As an appointed expert for the defense, Lowry was an agent of defense counsel. Exhibit 15(a) reflects Lowry's questions and comments about the strengths and weaknesses of the defense theory. A document that contains "comments by the attorney concerning his trial strategy or opinions of the strengths and weaknesses of the case" is highly privileged work product.[7] *See Wash-*

---

7. In *Washington* we addressed the scope of the work product doctrine as it pertained to a tape recorded interview:

This Court has examined the scope of the work-product rule in determining whether recordings of interviews with witnesses were discoverable. [Citation omitted.] At one ex-

*ington,* 856 S.W.2d at 188. A document of this nature is precisely the type of document intended to be protected by the work product doctrine.

■ Notwithstanding the above, the State relies on *Nobles* to claim that the privilege was waived when Lowry testified. In *Nobles,* the Supreme Court concluded that the work product doctrine, as applicable to the report of a defense investigator, was waived when the investigator was called as a witness and attempted to make "testimonial use" of the report. 422 U.S. at 239–40, 95 S.Ct. at 2170–71. The only evidence linking the defendant to the robbery at issue in *Nobles* was the testimony of two eye-witnesses for the prosecution who identified the defendant as the robber. On cross-examination, defense counsel asked one of the eye-witnesses if he remembered telling the defense investigator that he had only seen the defendant's back and asked the other eye-witness if he recalled telling the investigator that "all blacks looked alike to him." When the defense called the investigator as a witness, the trial court ruled that a copy of his report, inspected and edited *in camera,* would have to be disclosed to the State at the completion of his testimony. When the defense stated that it did not intend to produce the report, the investigator was not allowed to testify about his interviews with the witnesses. The United States Supreme Court held the work product doctrine did not protect the report from the limited disclosure ordered by the trial court.[8] *Id.* Although normally no waiver occurs when counsel relies on privileged materials to examine a witness, waiver *does* occur when the witness attempts to make "testimonial use" of the material:

> Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.

*Id.* at 240 fn. 14, 95 S.Ct. at 2171 fn. 14; *see also Washington,* 856 S.W.2d at 189.

■ This Court gives the phrase "testimonial use" a narrow meaning for purposes of waiving work product material:

> In Texas, "testimonial use" [as utilized by the Supreme Court in *Nobles* ] is expressed as "use before the jury," a term most typically associated with a defendant's request for production of work-product shielded materials used by the State at trial. "The work product privilege has generally been limited to documents which themselves do not contain admissible evidence of the offense but instead are summaries of the evidence or discussions about the offense that have been prepared for the internal use of law enforcement officers[,]" but this privilege does not extend to statements used before the jury. *A document has been "used before the jury" when shown to a witness on the stand, identified by a witness, or partially read aloud to the jury." In other words, [counsel for the party claiming the privilege] "must in some way inform the witness that the document or statement is being referred to during the examination[ ]"* and the contents put before the jury in such a way that they become an issue before the [other party] is entitled to inspect the documents.

*Washington,* 856 S.W.2d at 189–90 (citations omitted and emphasis added). Appellant did

---

treme, a recording of a statement made by a witness without any questions by the interviewer is clearly discoverable.... At the other extreme, *a recording is not discoverable if it contains only comments by the attorney concerning his trial strategy or opinions of the strengths and weaknesses of the case. Cullen [v. State],* 719 S.W.2d [195] at 198 [(Tex.Crim. App.1986)]; *Johnson v. State,* 650 S.W.2d 784, 790 (Tex.Crim.App.1983) (officers' additions to transcript of tape recorded conversation be-

tween defendant and co-conspirator were interpretation of original tape and therefore work-product).

856 S.W.2d at 188 (emphasis added).

8. The Federal Rules of Evidence were not in effect at the time of Nobles' trial and therefore were not a factor in the Court's decision. *Id.* at 232 n. 6, 95 S.Ct. at 2167 n. 6.

not "use [Exhibit 15(a)] before the jury" within the scope of *Washington.* Neither defense counsel nor Lowry made any reference to Exhibit 15(a) during Lowry's testimony. Testifying about topics addressed in the document does not place it within the meaning of the phrase "use before the jury" and therefore Lowry did not waive the privilege by virtue of testifying. *See id.* (document must be identified, read aloud from or specifically referred to).[9]

## B. Rule 705

■ The State contends Exhibit 15(a) was discoverable, despite any privilege, under Rule of Criminal Evidence 705 as "underlying facts or data" supporting Lowry's opinion. Rule 705 provides in part that an expert witness may be required to disclose "the underlying facts or data upon which [his] opinion is based." TEX.R.CRIM.EVID. 705(a). An expert's opinion must have "sufficient underlying facts or data" in order to be admissible. TEX.R.CRIM.EVID. 705(c).

Assuming *arguendo* that an otherwise privileged document can be rendered subject to disclosure under Rule 705, Exhibit 15(a) does not fall within the confines of Rule 705. Materials that serve as the "underlying facts or data upon which [the expert's] opinion is based" are discoverable under Rule 705. A "fact" is

> a thing done ... the quality of being actual ... something that has actual existence ... an actual occurrence ... a piece of information presented as having objective reality.

Webster's New Collegiate Dictionary 406 (1981). "Data" is defined as:

> factual information (as measurements or statistics) used as a basis for reasoning, discussion, or calculation.

*Id.* at 286. Exhibit 15(a) does not by any stretch constitute "facts or data" underlying Lowry's opinion. Exhibit 15(a) reflects Lowry's mental processes upon his initial review of the case—his thoughts about the strengths and weaknesses of the defense theory and questions he wanted to discuss with defense counsel. While these mental impressions may have been *based upon* facts and data (such as information contained in the State's file), subjective impressions, questions, and comments do not amount to "an actual occurrence," "information presented as having objective reality" or "factual information." Therefore, Rule 705 does not apply here.

## C. Harm

■ The State further asserts that any error was harmless in view of the overwhelming evidence against appellant. The State also claims Exhibit 15(a) did not include any evidence the jury had not already heard from State's witnesses regarding "the blood alcohol level of Twila, the location of the various parties when they were mortally wounded and the presence of Appellant in the house after the blood of the victims began to flow and his later discovery several blocks away at a friends house." Appellant argues it is impossible to conclude the error made no contribution to the conviction in light of the fact that Exhibit 15(a) was utilized by the State to effectively impeach Lowry's testimony. *See* TEX.R.APP.PROC. 81(b)(2).

Lowry's testimony was offered by appellant to establish the defensive theory that appellant was mentally and physically unable to commit the three murders. In Exhibit 15(a) Lowry articulated several factual weaknesses in this theory. He noted that appellant had the "presence of mind" around midnight to threaten Reed. He pointed out that appellant "had the presence of mind" when he woke up to realize that the bottle of vodka he had been drinking was not where he had left it. He pointed to portions of appellant's statement supporting appellant's ability to do active things while drunk. He raised the possibility that appellant could have taken the codeine *after* the murders because, if

---

**9.** Civil Rule of Procedure 166b distinguishes between an expert who was retained for advising only and an expert who was retained for purposes of testifying. Under this rule the "mental impressions" of an expert who is expected to be called as a witness are discoverable, but the same are not discoverable from a consulting expert who is not expected to be called to testify, unless the consulting expert's opinion or impressions have been reviewed by the testifying expert. There is no such rule in the criminal arena in Texas.

taken before, it would be "highly unlikely" that he would have awakened at midnight and doubtful that he could have made it to Reed's house by 3:00 a.m. He also raised the possibility that appellant could have committed the murders if (1) the three victims were all in separate rooms of the house; (2) if Twila was so drunk that she could not defend herself; and, (3) if Elwin had been asleep.

Lowry was cross-examined by the State about all of the weaknesses in the defensive theory that are raised in Exhibit 15(a). Portions of some of the State's questions were verbatim from Exhibit 15(a). However, the State's impeachment of Lowry was extensive and also pointed to inconsistencies between the defensive theory and the State's evidence that were not brought out in Exhibit 15(a). For instance, Lowry testified on direct examination that with the levels of alcohol and codeine in appellant's system, it would have been "highly unlikely" that he could have awakened at midnight and doubtful he could have made it to Reed's house by 3:00. But, the State pointed to the fact that according to Reed's testimony, appellant walked to her house, some four blocks from his own, a few minutes after midnight, was able to request that she suture his hand, and was able to remove his shirt with no apparent difficulty and place it on the back of a chair. These events were not contained in Exhibit 15(a).

Furthermore, before disclosure of Exhibit 15(a), the State questioned Lowry about the fact that appellant had missed the vodka bottle upon awakening—a fact brought out in appellant's interview with police. Also, the State's evidence showed that at least two of the victims were murdered in separate rooms and that appellant was in the house after the murders as evidenced by his bloody handprints. The most critical evidence revealed in Exhibit 15(a) that was not otherwise revealed in the State's evidence was evidence of Twila's drunkenness.[10] However, even though the State's evidence did not reveal Twila's specific blood alcohol level, the State's evidence did suggest that she had been drinking that night. Although the State referred in closing argument to Lowry's testimony as to Twila's intoxication and its probable affect on her ability to defend herself,[11] it was mentioned only once, and then only briefly.

Thus, we conclude beyond a reasonable doubt, based upon our review of the record, that disclosure of Exhibit 15(a) did not contribute to the jury's verdict at guilt/innocence or punishment. While the State's case was not as fully developed as it might have been,[12] all the evidence that *was* gathered and admitted pointed to appellant. The defensive theory was not particularly plausible in light of the evidence concerning appellant's actions at midnight in going to Reed's house and his behavior there. Most of the matters raised in Exhibit 15(a) were common sense deductions based on the State's evidence. Further, impeachment on the matters contained in Exhibit 15(a) was only a small portion of the State's cross-examination of Lowry. Lowry's testimony was extensively impeached apart from the matters con-

10. Appellant says in his brief that apart from Lowry's testimony, there was no evidence in the record as to the level of Twila's intoxication. The State says State's witnesses testified "concerning the blood alcohol content of Twila" but does not indicate which witnesses or point with specificity to the record. From our review of the record appellant is correct that the State's evidence did not include evidence of the level of Twila's intoxication. While the autopsy reflects that toxicological studies were ordered from DPS, the results were not included in the autopsy report and the pathologist did not testify to having received such results.

11. The State argued at trial that Lowry merely reiterated what the pathologist said that, "Twila Busby could not have probably defended herself because of her intoxicated state of .19 percent

blood alcohol." However, as mentioned previously, the prosecutor was wrong about the fact that Peacock testified to Twila's state of intoxication. *See* fn 10, *supra.*

12. The State's own statement of facts concedes deficiencies in the investigation of the case such as the failure to analyze the blood on the blade of the knife found on the front porch, the failure to analyze the hairs in the palms of Twila Busby's hands and under her ring, the failure to analyze clippings of Twila's bloody fingernails, and the failure to perform a blood spatter test to determine whether the blood stains on Appellant's pants and shirt were transfer patterns that could have gotten on his clothes from simply touching the victims or whether they were cast off spatters from having killed them.

tained in the exhibit. Points of error two through six are overruled.

■ In his seventh point of error, appellant claims the trial judge erroneously precluded him from asking a proper question. Specifically, appellant wanted to ask veniremembers "whether they could consider evidence that was not related to his blameworthiness [to be] mitigating evidence." When a defendant claims he was improperly restricted on voir dire, an abuse of discretion standard of review is applied. *Nunfio v. State*, 808 S.W.2d 482, 484 (Tex.Crim.App. 1991); *Green v. State*, 934 S.W.2d 92, 106 (Tex.Crim.App.1996). The propriety of the question which the defendant sought to ask is determinative of the issue. *Id.*; *Green*, 934 S.W.2d at 106. A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Id.*

The issue of mitigating evidence is indeed applicable to capital cases in which the death penalty is sought as jurors are asked to determine whether a sufficient mitigating circumstance or circumstances exist to warrant that a sentence of life be imposed rather than death. *See* Article 37.071 § 2(e). However, jurors are also instructed that "mitigating evidence" is "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Article 37.071 § 2(f)(4). Hence, the wording of appellant's desired question, whether jurors could consider evidence not related to appellant's blameworthiness to be mitigating, was, in fact, contrary to the law. Because of this, the trial court acted within its discretion in disallowing the question as improper.[13] *See McCarter v. State*, 837 S.W.2d 117, 120 (Tex.Crim.App.1992)(citing *Abron v. State*, 523 S.W.2d 405, 408 (Tex.Crim.App.1975)). Appellant's seventh point of error is overruled.

■ In his twentieth point of error appellant claims the trial judge erroneously overruled his objection to the prosecutor's statement to a prospective juror "that the State would scientifically prove that appellant murdered Twila Busby with an ax and stabbed two retarded kids with a knife." The record

reveals that about one-half of the way through the voir dire of J.T. Williams, the following occurred:

[THE STATE:] Okay. I think the evidence in this case, Mr. Williams, is going to be that on New Years Eve of 1993 the woman, in whose house he was living with her two mentally retarded sons, left and went out on New Years Eve without him and when she came home she was clubbed to death with an axe handle. The evidence will further show her two mentally retarded sons were stabbed to death and the evidence will show, scientifically, that [appellant] is the one who did it. That's what I think the evidence will show.

[DEFENSE COUNSEL:] Your Honor, I'm going to object to [the prosecutor] expressing his personal opinion about what the evidence will show. Which is what he is doing.

THE COURT: I will allow at this point [sic].

[THE STATE:] That is the type of case we are going to be trying here. There will be testimony from police officers who investigated it, . . . . There will be testimony of scientists, there will be some DNA testimony. . . . I expect the evidence will show you fingerprint testimony, . . . . I think the evidence will also bring you medical testimony from a pathologist who was personally there and saw the scene before the bodies were moved and that generally will be type of case brought to you by the State.

While the prosecutor's statement is more appropriately the subject of an opening statement, it did not improperly inject the prosecutor's personal opinion into the case. An advocate may argue that the evidence shows a certain contention. *Jones v. State*, 843 S.W.2d 487, 498 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). Point of error twenty is overruled.

■ In points of error eight through ten, appellant claims the trial judge erred when he refused to instruct the jury on the lesser-included offense of murder. Appellant ar-

13. We further note that appellant did not attempt to ask the question in a different form.

gues that he was entitled to the instruction because the jury could have found that his voluntary intoxication temporarily destroyed his capacity to form the culpable mental state required to convict him of capital murder. In other words, appellant appears to argue that the jury could have found that his voluntary intoxication negated the mens rea of intent or knowing action thus making him guilty only of the lesser-included offense of a reckless murder because he caused the death of each victim by performing an act clearly dangerous to human life while "in the course of committing the reckless or negligent homicides of the other victims."

Appellant recognizes that this Court has held that Texas Penal Code § 8.04(a) bars the use of evidence of voluntary intoxication to negate the culpable mental state of a crime—exactly what appellant is in effect attempting to do here. *Hawkins v. State,* 605 S.W.2d 586 (Tex.Crim.App.1980); *Ramos v. State,* 547 S.W.2d 33 (Tex.Crim.App.1977). However, he asserts that application of this holding violates his due process rights by relieving the State of proving every element of the offense.

In *Rousseau v. State,* 855 S.W.2d 666, 673 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993), we established a two-prong test to determine whether a defendant is entitled to a charge on a lesser-included offense. This test satisfies constitutional due process concerns. *Id.* We held in *Rousseau:*

> [F]irst, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record *that would permit a jury rationally to find* that if the defendant is guilty, he is guilty only of the lesser offense.

(Emphasis in original.) It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted. *Bignall v. State,* 887 S.W.2d 21, 24 (Tex.Crim.App. 1994). Neither party disputes that murder is a lesser-included offense of capital murder.

Therefore, the first prong of the *Rousseau* test is met.

As to the second prong, for a rational jury to find that appellant was guilty *only* of murder, there must exist some evidence in the record that appellant did not intentionally or knowingly kill the victims. Under Texas Penal Code § 6.03, the relevant culpable mental states are as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

For appellant to be entitled to a lesser-included instruction of murder under these definitions, a rational jury must be able to find that appellant behaved in such a way that he consciously disregarded a substantial and unjustifiable risk toward the victims, but was not aware that his conduct was reasonably certain to cause the resulting deaths. This is not supported by the record.

A review of the record shows that Twila was strangled into unconsciousness and struck with an ax handle about the face and head at least fourteen times. A rational jury could only conclude from this that appellant was aware that his conduct was reasonably

certain to cause Twila's death. This is further supported by the testimony that appellant had also threatened to beat his ex-wife to death with a club. The record further shows that Randy was found laying face down in the upper bunk covered in blood. He had been stabbed in the back three times. A rational jury could not have found this killing to have been carried out in anything less than a knowing manner. Finally, the record shows that Elwin was mortally stabbed under his left arm and had superficial wounds to his right hand and stomach. Again, it would not be rational for a jury to conclude that appellant was not aware that his conduct was reasonably certain to cause death. Given these facts, a rational jury could not have found that appellant did not intentionally or knowingly kill each of the victims. Because appellant has not met the second prong of the *Rousseau* test, he was not entitled to a charge on the lesser-included offense of murder. Points of error eight through ten are overruled.

In related point of error eleven, appellant submits that Texas Penal Code § 8.04(a), which states, "Voluntary intoxication does not constitute a defense to the commission of crime," does not bar him from receiving a lesser-included instruction for murder. Because of our holding on points eight through ten, we need not address this point. Consequently, point of error eleven is overruled.

■ In his twelfth point of error, appellant complains the definition of "intentionally" in the abstract portion of the jury's instructions was fundamentally erroneous because it authorized a conviction for capital murder without requiring the jury to find that element of the crime. In other words, appellant argues, the definition included in the charge described a culpable mental state not existing in Texas law.

■ In the abstract portion of appellant's charge, the following definitional instruction was given:

14. The instruction should have been worded:

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective *to* desire to cause the result.

(Emphasis added.) [14] Appellant failed to object to this definition at trial. Because appellant failed to preserve his complaint, he is only entitled to a reversal if he can show egregious harm, or harm so great that appellant was denied a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim. App.1984) (op. on reh'g); *see also Gibson v. State*, 726 S.W.2d 129, 133 (Tex.Crim.App. 1987). In determining whether egregious harm occurred, this Court must review the error "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial court as a whole." *Almanza, supra; Bailey v. State*, 867 S.W.2d 42 (Tex.Crim. App.1993).

It is clear from the evidence that the killer meant to cause the resulting deaths of his victims: Twila had been strangled into unconsciousness and received at least fourteen blows to her face and head with a club; Randy had been stabbed in the back three times while still asleep and lying face down in his bed; and Elwin had received one mortal stab wound with additional superficial wounds. The issue primarily contested in the case was that of the identity of the perpetrator. Finally, appellant was indicted for "intentionally and knowingly" killing three people during the same criminal transaction. "Knowingly" was appropriately defined just beneath the erroneous "intentionally" instruction as: "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." The jury found appellant "guilty of the offense of Capital Murder as charged in the indictment."

Looking at the entirety of the record and the context in which the erroneous instruction was included, we conclude that the jury

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

acted appropriately despite the typographical error in the charge. Hence, appellant was not so egregiously harmed that he was deprived of a fair and impartial trial. *See Hughes v. State*, 897 S.W.2d 285, 296–97 (Tex.Crim.App.1994). Point of error twelve is overruled.

■ In points of error thirteen and fourteen, appellant asserts that the trial judge erred in admitting irrelevant testimony at the punishment phase of trial. Specifically, appellant complains that the trial judge erred in overruling his objection when the State elicited testimony from appellant's ex-wife that appellant repeatedly asked her to engage in sodomy when they were married. Appellant contends that this evidence was irrelevant to any issue in the case and its prejudicial impact substantially outweighed any probative value it may have had.[15]

Assuming the admission of this testimony was irrelevant and, therefore, inadmissible, we hold it was harmless beyond a reasonable doubt. In its questioning of the witness, the State first explored the character of the prior relationship between the witness and appellant and then proceeded to ask questions about appellant's verbal and physical abuse towards her.[16] At no time was any of this testimony placed in the context of sexual behavior. Then, some eight pages into the total twenty-seven pages of the witness' testimony, the following occurred:

> [THE STATE:] Connie, I want to talk to you a little bit about your sexual relationship with [appellant]. Could you tell the jury what type of sex act he preferred you to engage in?
>
> [DEFENSE COUNSEL:] Your Honor, I'm going to object. It's totally irrelevant, it has nothing to do with any issue in this

case unless the Counsel can demonstrate some relationship. And I would prefer that to be done outside the presence of the Court (sic), but the sexual habits of [appellant] and [appellant's former wife] are not relevant.

THE COURT: The objection is overruled.

[THE STATE:] You can answer the question.

[THE WITNESS:] Repeatedly, he wanted sodomy and I refused.

[DEFENSE COUNSEL:] Judge, I must object. This is irrelevant. There is no probative value to this. It is an attempt to inflame the minds of the jury in this case on irrelevant matters, and I ask that it be stricken from the record and that the jury be asked to disregard it.

This certainly—I know there's a leeway, Your Honor, in these types of cases as far as how—but this has gone beyond the realm of propriety or relevancy.

THE COURT: Objection overruled.

This was the only question asked concerning the couple's sexual relations and the subject was not mentioned again. The remainder of the testimony stressed appellant's alcohol and drug abuse and brought out incriminating behavior on appellant's part such as his threatening to beat the witness to death with an ax handle. The complained-of testimony was brief and isolated. Given the state of the record, we conclude beyond a reasonable doubt, that admission of this testimony did not contribute to the jury's verdict at the punishment stage of trial. Appellant's thirteenth and fourteenth points of error are overruled.

■ Appellant avers in points of error fifteen through seventeen that the trial judge

---

**15.** No evidence was presented that any type of force, violence, or other form of coercion accompanied appellant's requests. See *Beam v. Paskett*, 966 F.2d 1563, 1571–73 (9th Cir.1992)(involvement in abnormal sexual relationships irrelevant to future dangerousness when no evidence of force or violence in behavior). Furthermore, sodomy between husband and wife is not an offense under the law and, therefore, does not amount to an extraneous offense. *See Baker v. Wade*, 553 F.Supp. 1121, 1126 (N.D.Tex.1982)(sodomy in heterosexual marriages no longer illegal after passage of

Tex.Penal Code § 21.06 in 1974). In any event, appellant's ex-wife testified that she repeatedly refused his requests, thus no acts were ever committed. *See Moreno v. State*, 858 S.W.2d 453, 463 (Tex.Crim.App.1993)(inchoate thoughts do not amount to extraneous acts).

**16.** The general nature of the physical abuse was that appellant would "sling [the witness] around the trailer," but never doubled up his fist and hit her. He also put his hand on her throat and threatened her at one point.

erred in denying his request for a limiting instruction at the penalty phase that directed the jurors to separately consider the evidence of each extraneous unadjudicated offense that the State alleged. Appellant alleges that this error offended Article 36.14, Tex.R.Crim.Evid. 105(a), and the Due Process Clause of the Fourteenth Amendment. In related points of error eighteen and nineteen, appellant claims the trial judge erred in refusing to instruct the jury that unadjudicated extraneous offenses must be proven beyond a reasonable doubt and that appellant was presumed to be innocent of these extraneous offenses until the State proved them.

In *Coble v. State*, 871 S.W.2d 192, 208 (Tex.Crim.App.1993), *cert. denied*, 513 U.S. 829, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994), this Court held that, as long as a charge properly sets forth the State's burden of proof, then the failure to include a separate jury instruction cautioning the jury to only consider those extraneous offenses proved beyond a reasonable doubt is not error. *See also, Lewis v. State*, 815 S.W.2d 560, 567 (Tex.Crim.App.1991), *cert. denied*, 503 U.S. 920, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992). The same reasoning can be applied to appellant's requested instruction that he be presumed innocent of the extraneous offenses.

The record reflects in the instant case that the jury was told that the State had the burden to prove the issue of future dangerousness beyond a reasonable doubt. Furthermore, the jury was given the required definition for "beyond a reasonable doubt." [17] Given this, it was not error for the trial judge to refuse to give any of the requested instructions. Points of error fifteen through nineteen are overruled.

In his twenty-first point of error, appellant contends that the death sentence violates the Eighth Amendment because this state does not have a uniform, consistently applied standard governing its imposition. In other words, appellant argues, the number of different schemes in effect since 1989 created different standards of imposition resulting in constitutional violation. This issue was considered and decided adversely to appellant in *Lawton v. State*, 913 S.W.2d 542, 559–60

(Tex.Crim.App.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996), and *McFarland v. State*, 928 S.W.2d 482, 521–22 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997). Appellant's twenty-first point of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

MCCORMICK, P.J., concurs.

OVERSTREET and WOMACK, JJ., dissent.

## APPENDIX

### COMMENTS & QUESTIONS

1. At midnight, Henry Skinner had presence of mind to threaten Andrea Joyce Reed. There was a 3-1/2 hour time span before Mr. Skinner was arrested. At what time did Mr. Skinner threaten Ms. Reed?

2. Henry Skinner and Twila Busby had an argument about Howard Mitchell. He told Twila not to go to Mr. Mitchell's house.

3. Henry Skinner stated in reference to the bottle of vodka, *"So she either drank it or when she went over to Howard's and carried it over there or I don't Know"*. This statement implies that Henry Skinner knew Twila went to Howard Mitchell's that night. He apparently was looking for the vodka when he woke up and had the presence of mind to recognize that the bottle was not where he had left it.

4. Henry Skinner stated that he had been drinking all day long. He had been drinking vodka and taking Xanax. Studies have shown that the combination of alcohol and alprazolam (Xanax) enhances behavioral aggression more than would have been predicted from the sum of the single effects, confirming clinical reports of behavioral dyscontrol.

5. Henry Skinner stated that every time that he and Twila drank hard liquor together they would blackout. When they woke up the next morning neither one could remember

17. *See Geesa v. State*, 820 S.W.2d 154 (Tex.Crim. App.1991).

what happened. The kids would tell them that they had been singing and dancing, and were falling all over the living room, but they could not remember anything. This statement supports his ability to do active things while drunk.

6. Henry Skinner had a blood alcohol level of 0.11% at 5:32 a.m.. Based upon that level, he would have had a blood alcohol level of 0.20% at midnight, which would not necessarily be causing unconsciousness. At 10:30 p.m., when observed unconscious, his blood alcohol level would have been 0.23%.

7. Toxicology studies showed Henry Skinner to have a codeine blood concentration of 0.11 mg./L. This analysis was carried out by EMIT, followed by confirmation with gas chromatography/mass spectrometry. Codeine has a half-life of 2.8 hours and 80% is eliminated, conjugated, and eliminated. Only 15% is metabolized, conjugated, and eliminated in the urine. To explain this codeine level, Mr. Skinner must have taken codeine during the early evening of 12/31/93 in a quantity 3-1/2 times the recommended therapeutic dose. This would have given him a blood codeine concentration of 0.40 mg./L at midnight, 2-1/2 times therapeutic level. Another explanation would be that Mr. Skinner took codeine before leaving the house after the murders, or he had codeine with him and took it while at Andrea Reed's house. Had Mr. Skinner taken the codeine prior to his becoming unconscious and not taken it again, it would be highly unlikely that he would have awaken at midnight with that level coupled with the alcohol level. It would be doubtful, but possible, that he could have made it to Ms. Reed's house by 3:00 a.m.. Was Andrea Reed mistaken about the time he arrived at her house?

8. Mr. Skinner stated he was taking Xanax (alprazolam) during the day of 12/31/93. However, none was detected during the toxicology screening. Alprazolam has a half-life of 11.2 hours. Assuming that Mr. Skinner's blood concentration of alprazolam was below detection limit at 5:30 a.m., he would have had a 0.075 mg./L blood concentration of alprazolam at midnight. This concentration would be equivalent of taking 2 3.0-mg. doses of alprazolam. If this had occurred, coupled with the alcohol and codeine, Mr. Skinner would not have awaken at midnight.

9. Henry Skinner apparently was awake and moving at midnight. Based upon his previous statement regarding his behavior while drunk, he possibly could have committed the murders if Twila Busby, Randolph Busby, and Edwin Caler were in separate rooms of the house. We know Twila and Randolph were in separate rooms. Twila was also very drunk, with a blood alcohol level of 0.19%. At this level, she would have been extremely uncoordinated and not able to defend herself. If Edwin Caler had been in another room of the house, possibly asleep, Henry could have killed Twila without someone interfering. If Edwin heard the noise and awakened, Henry probably would have killed Edwin as he entered the room. After this, he could have gone to Randolph's room and killed him.

10. Who is Shane Bromlow?