**Affirmed and Memorandum Opinion filed September 2, 2021.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00616-CR

## OMARI TAFARI CHAMBERS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 1626262**

## MEMORANDUM OPINION

Appellant Omari Chambers appeals his conviction for manslaughter. After a jury convicted him, the trial court assessed punishment at fifteen years in prison. In two issues, appellant contends that the trial court erred in (1) admitting a recording of his oral statement into evidence when the recording equipment failed to record approximately the final three minutes of the statement, and (2) refusing to instruct the jury on the lesser-included offense of negligent homicide. We affirm.

## *Background*

According to several witnesses, including complainant's girlfriend Ashley Lane, in the evening of July 22 and early morning of July 23, 2017, complainant had been drinking and had become intoxicated. Complainant was on the shared balcony at his apartment complex with his girlfriend and some neighbors. At some point, appellant rode up to the complex on his bicycle and asked someone on the balcony where someone else was. Complainant threatened, cursed, and yelled at appellant. Some witnesses said appellant argued back. Eventually, complainant went down the staircase toward appellant and got within a couple of feet of him, still yelling and cursing. At this time, appellant said that he did not want to argue with or fight complainant and rode away on his bicycle. One witness said that the two shook hands before appellant left. Complainant continued to be combative with others on the balcony, and all except complainant and Lane eventually left the balcony.

A short time later, appellant returned to the apartment complex and a second confrontation occurred. According to Lane, she had gone inside her apartment to get her purse, and when she came back outside, she saw appellant about halfway up the staircase. Complainant, who was unarmed, was standing at the top of the stairs and kicked his leg out, apparently to keep appellant from coming further up the stairs. Lane explained that it was not a full kick, that complainant did not fully extend his leg but appeared to be trying to keep appellant from coming further up the stairs. Lane also said that she did not see the kick contact appellant. After complainant kicked out, appellant lunged forward. Lane said that she could not see what was in appellant's hand when he lunged forward, but immediately afterwards, complainant began bleeding from his leg. Appellant went down the stairs and fled the scene. A couple of witnesses from the neighboring apartment reported hearing

2

Lane scream.

Complainant lay on the staircase until EMS transported him to the hospital where he subsequently died. An autopsy listed the cause of death as a laceration of the femoral artery of complainant's left leg.

Appellant was apprehended nearby that same morning while riding his bicycle. The arresting officer noticed blood on appellant's hands and on a towel found near the spot of the arrest. Blood was also later discovered on appellant's shoes. The arresting officer took appellant back to the scene where he was identified by witnesses.

Appellant was interrogated by Pasadena Police Detective Chris MacGregor, and a video recording of the interrogation was played at trial. The video is slightly over two hours and forty-four minutes long but ends abruptly before the interrogation concludes. Early in the video, appellant acknowledged having the initial confrontation with complainant, explaining that complainant was drunk and aggressive but no physical contact occurred. For most of the video, appellant denied returning to the complex or even knowing what happened to complainant. At around the 2:35 mark, appellant stopped denying MacGregor's accusations. Appellant then said "it wasn't even an argument" and asserted complainant threw his foot out and was going to kick appellant down the stairs. At around 2:40, appellant acknowledged stabbing complainant with a small black pocketknife. He demonstrated the motion that he used to stab complainant and said that the knife remained in complainant's leg when appellant left down the stairs. The video recording abruptly stops at 2:44:17 while appellant is talking about what being in prison is like.

At a pretrial hearing on appellant's motion to suppress the video recording, appellant called Ryan Marshall to testify. Marshall is a business systems analyst

3

for the City of Pasadena and provides technical support to the police department and their Genatech videorecording system. He said that after the system was installed in 2014 or 2015, they experienced occasional problems with the system such as poor recording quality, failure to record, and staff training issues. In the 2016-17 period, they were having "consistent problems" with the system, such as server errors like not having enough memory to save recordings, training problems, camera and microphone configuration issues, and retention policy problems. He also acknowledged there had been problems when recordings would stop before interviews were completed, but he was unaware of any hardware problem causing the stoppage. Marshall said that during that period, he was being called for assistance with the system less than ten times a week. He denied, however, that it was common knowledge within the police department or the technology department that the system was causing problems.

Marshall explained that the premature stopping of a recording could be due to hardware or software issues, user intervention, or motion and sound detectors being misread by the system. Marshall did not specifically recall any problems related to the video recording at issue in this case.

Appellant also called MacGregor to testify. He testified that he knows how to work the Genatech system and was the person who started it for appellant's interview and the system was working at that time. MacGregor explained that when he went to download the video, he discovered that the last few minutes of the interview had not been recorded. To his knowledge, neither he nor anyone else turned the system off prematurely. He explained that he would have heard the toggle switch if someone else had done it. He acknowledged that this was not the first time that he had had an issue like this with the Genatech system, but he described the issues as "pretty infrequent." MacGregor estimated that two to four

4

minutes of the interview had been cut off, saying, "It was at the very end when we were just discussing the knife issue . . . the type of knife and then where he had disposed of it." MacGregor also said that they have resolved the issues with the system and have not been having any issues lately. On cross-examination, MacGregor agreed that the interview was going well for the investigation and there would have been no reason for him to turn off the recording while appellant was making incriminating statements.

In the order denying the motion to suppress, the trial court found that the Genatech system was capable of making an accurate recording at the time of appellant's interview but did not always do so. The court also found that there was no evidence that the portion of the interview that did record was altered or otherwise inaccurate or that the unrecorded portion contained evidence that would alter the impact of the recording such as a recantation. The trial court noted that the recording contained no interruptions or restarts, just a small missing segment at the end of the interview.

Appellant objected again when the video was offered into evidence during trial, and the trial court overruled that objection. At the conclusion of trial, the jury was instructed on murder, the lesser-included offense of manslaughter, and self-defense, but the trial court denied appellant's request for an instruction on the lesser-included offense of criminally negligent homicide. The jury convicted appellant of manslaughter. After appellant pleaded true to a previous conviction for the felony offense of attempted robbery, the trial court assessed punishment at fifteen years in prison.

### *The Incomplete Recording*

In his first issue, appellant challenges the trial court's admission of the video-recorded interrogation into evidence. Specifically, appellant contends that

5

the video was inadmissible because it was made using equipment that was incapable of making an accurate recording and it was incomplete.

**Governing law.** Appellant's issue implicates Texas Code of Criminal Procedure article 38.22, section 3(a)(3). Section 3(a) states in full:

> Sec. 3. (a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
>
> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>
> (3) **the recording device was capable of making an accurate recording**, the operator was competent, **and the recording is accurate and has not been altered**;
>
> (4) all voices on the recording are identified; and
>
> (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

Tex. Code Crim. Proc. art. 38.22, § 3(a) (emphasis added).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). As long as the court's ruling is within the zone of reasonable disagreement, we will not disturb the ruling. *Id*. We afford almost total deference to a trial court's determination of historical facts that the record supports, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Mixed questions of law and fact,

6

also known as application of law to fact questions, are reviewed de novo unless the resolution of those ultimate questions turns on credibility and demeanor. *Id*. Video evidence is viewed in the light most favorable to the trial court's ruling, but if the video evidence does not support the trial court's conclusions regarding the video, we must disregard those conclusions. *See Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012).

Section 3(e) of article 38.22 provides that courts must strictly construe subsection (a) and may not interpret subsection (a) as making admissible a statement unless all requirements of the subsection have been satisfied by the State, with two inapplicable exceptions. Tex. Code Crim. Proc. art. 38.22 § 3(e). In other words, section 3(e) requires strict compliance with all portions of section 3(a). *See Woods v. State*, 152 S.W.3d 105, 116 (Tex. Crim. App. 2004); *Davidson v. State*, 25 S.W.3d 183, 186 (Tex. Crim. App. 2000). Accordingly, all of section 3(a)(3)'s requirements, that "[1] the recording device was capable of making an accurate recording, [2] the operator was competent, and [3] the recording is accurate and has not been altered," must be met for a recorded statement to be admissible. Tex. Code Crim. Proc. art. 38.22 § 3(a)(3). Appellant argues that the recording device in this case was incapable of making an accurate recording and that the incomplete nature of the recording means that the recording was inaccurate and altered.

**Misplaced reliance.** Appellant bases much of his argument on an unpublished plurality opinion from the Court of Criminal Appeals, which held that a videorecording of a defendant's interview with police was inadmissible under article 38.22, section 3(a)(3) where approximately 30 minutes in the middle of the interview was missing, there was evidence that multiple relevant statements went unrecorded, and the State used the missing minutes to undermine the defendant's trial testimony. *Flores v. State*, No. PD-1189-15, 2018 WL 2327162, at *1-3, 5, 8

7

(Tex. Crim. App. May 23, 2018) (plurality op.) (not designated for publication). Unpublished opinions of the Court of Criminal Appeals "have no precedential value and *must not be cited as authority* by counsel or by a court." Tex. R. App. P. 77.3 (emphasis added). Accordingly, the holding in *Flores* and the reasoning in the plurality opinion do not control our analysis in this case. *See Munoz v. State*, No. 08-19-00072-CR, 2020 WL 6375333, at *4 n.1 (Tex. App.—El Paso Oct. 30, 2020, pet. ref'd) (not designated for publication) (explaining appellant's reliance on *Flores* was misplaced).

**Capable of recording.** Appellant first briefly argues that the videorecording in this case did not meet the requirements of subsection 3(a)(3) because the Genatech system used to make the recording was incapable of making an accurate recording. Appellant bases this argument on the testimony from Detective MacGregor and IT analyst Marshall regarding problems the system was experiencing during the relevant period. Marshall described the problems as "occasional" and "consistent" and said he was being called for assistance less than ten times a week during that time. However, he described a range of problems being encountered with the system, not all of which would necessarily result in an inaccurate recording. MacGregor described the problem of the system prematurely stopping as "pretty infrequent." Although this evidence clearly indicates there were problems with the Genatech system, such problems do not appear to have risen to the level of rendering the system incapable of making an accurate recording. In fact, a logical conclusion from the evidence would be that the system usually recorded properly. Accordingly, the trial court did not abuse its discretion in concluding that the system was capable of making an accurate recording at the time of appellant's interview, and we defer to that conclusion. *See Guzman*, 955 S.W.2d at 89.

8

**Accurate and unaltered.** Appellant next argues that the recording was altered or inaccurate because the recording stopped before the interview was completed. MacGregor estimated that the last two to four minutes of the interview went unrecorded. The State points out that the last two minutes and fifty-one seconds of the video shows a static, frozen image and suggests that this was the amount of time between when the system stopped recording and MacGregor turned off the system. There is no explanation in the record, however, regarding this static image, but regardless, the only evidence indicates two to four minutes were not recorded. MacGregor indicated that during this last small portion of the interview, they "were just discussing the knife issue . . . the type of knife and then where he had disposed of it." The last of the recorded part of the interview corroborates this to a degree as it shows them discussing the knife shortly before the recording ends.

Nothing on the video or otherwise in evidence suggests that anything exculpatory was said during the unrecorded portion of the interview. As described above, appellant had already admitted to stabbing complainant earlier in the recorded portion, and appellant had made statements setting up his claim of self-defense. Moreover, nothing in evidence suggests that the failure to record was intentional; to the contrary, the evidence shows it to be accidental. The recording system periodically had problems including untimely, uncontrolled stopping. Accordingly, "the evidence supports the position that the [video] was accurate and had not been impermissibly 'altered' in the sense contemplated by Article 38.22[,] § 3(a)(3)." *Maldonado v. State*, 998 S.W.2d 239, 245 (Tex. Crim. App. 1999) (affirming admission of video that contained gaps of a few seconds in the conversation because the evidence supported the conclusion that the anomalies occurred accidentally and obscured nothing of value in the dialogue); *see also Denison v. State*, No. 01-17-00658-CR, 2019 WL 1186662, at *5-7 (Tex. App.—

9

Houston [1st Dist.] Mar. 14, 2019, no pet.) (mem. op., not designated for publication) (affirming admission of video when parts were inaudibly muffled but record supported trial court's conclusion that the cause was "appellant's 'soft-spoken' speech"); *Baez v. State*, No. 14-07-00426-CR, 2008 WL 4915682, at *3 (Tex. App.—Houston [14th Dist.] Nov. 18, 2008, pet. ref'd) (mem. op., not designated for publication) (affirming admission of video under *Maldonado* and subsection 3(a)(3) despite low audio quality and "electronic hum" that rendered parts inaudible); *Vasquez v. State*, No. 07-01-00232-CR, 2002 WL 737369, at *7–8 (Tex. App.—Amarillo Apr. 26, 2002, pet. ref'd) (not designated for publication) (affirming admission of video when recording equipment inadvertently stopped recording part of the conversation but no evidence indicated the missing portion contradicted or negated the recorded confession).

The trial court was free to believe MacGregor's testimony regarding the cause and content of the unrecorded portion at the end of the interview, and we must defer to the trial court's determination because it concerns an assessment of credibility. *See Guzman*, 955 S.W.2d at 89. The trial court did not abuse its discretion in refusing to suppress the recorded statement. *See Maldonado*, 998 S.W.2d at 245-46. We therefore overrule appellant's first issue.

### *Lesser-Included Offense Instruction*

In his second issue, appellant contends that the trial court erred in refusing to instruct the jury on the lesser-included offense of criminally negligent homicide. Appellant was charged with murder, and the trial court instructed the jury on the elements of murder, the lesser-included offense of manslaughter, and self-defense. The trial court denied appellant's additional request for an instruction on criminally negligent homicide.

**Governing law.** We review a trial court's refusal to instruct the jury on a

10

lesser-included offense for an abuse of discretion. *See Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004); *Chaves v. State*, No. 01-19-00524-CR, 2021 WL 2231246, at \*7 (Tex. App.—Houston [1st Dist.] June 3, 2021, no pet. h.). In considering whether a lesser-included offense instruction should have been given, we analyze whether the elements of the lesser-included offense are included within the proof necessary to establish the elements of the charged offense and whether there is evidence in the record that could allow a jury to rationally find the defendant guilty of only the lesser-included offense. *See State v. Meru*, 414 S.W.3d 159, 161 (Tex. Crim. App. 2013).

The latter step requires an examination of all the evidence admitted at trial, not just the evidence presented by the defendant. *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016). Although anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser-included offense instruction, the evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Id.* It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted. *Id.* Mere speculation is not sufficient to meet this threshold. *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012).

**Lesser-included offense.** It is well established that criminally negligent homicide is a lesser-included offense of murder and of manslaughter. Tex. Code Crim. Proc. art. 37.09 (definition of lesser included offense); *compare* Tex. Penal Code §§ 19.02 (murder) *with* .05 (criminally negligent homicide) *and* .04 (manslaughter); *see, e.g.*, *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020) (criminally negligent homicide); *Britain v. State*, 412 S.W.3d 518, 520 (Tex.

Crim. App. 2013) (manslaughter). We therefore turn to the second step and consider whether there is evidence in the record that could allow a jury to find the defendant guilty of only criminally negligent homicide. *See Meru*, 414 S.W.3d at 161.

**The evidence.** Criminally negligent homicide includes all the elements of manslaughter except for manslaughter's higher culpable mental state. *Britain*, 412 S.W.3d at 520. To be convicted of manslaughter, an accused must be found to have been reckless—meaning, with respect to circumstances surrounding the actor's conduct or the result of that conduct, to be aware of but consciously disregard a substantial and unjustifiable risk of death that was of such a nature and degree that its disregard constituted a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. Tex. Penal Code §§ 1.07 (43), 6.03(c) (definition of reckless); *see also Masterson v. State*, 155 S.W.3d 167, 172 (Tex. Crim. App. 2005). To be convicted of criminally negligent homicide, an accused must be found to have acted with criminal negligence—meaning, with respect to circumstances surrounding the actor's conduct or the result of that conduct, that the actor ought to have been aware of a substantial and unjustifiable risk of death that was of such a nature and degree that the failure to perceive it constituted a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. Tex. Penal Code §§ 1.07 (15), 6.03(d) (definition of criminal negligence). In short, in order for appellant to be entitled to an instruction on criminally negligent homicide in addition to the manslaughter instruction, there needs to be evidence in the record indicating appellant was not aware of the risk associated with his conduct. *See Haley v. State*, 396 S.W.3d 756, 769 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see also*

*Mendieta v. State*, 706 S.W.2d 651, 652 (Tex. Crim. App. 1986). Such evidence, like for all mental states, is typically drawn through inference from the circumstances and not from direct evidence. *See Haley*, 396 S.W.3d at 769.

Appellant asserts that he "may have been unreasonable in not perceiving the risk which his conduct created" because he was holding a knife while the decedent was kicking down at him and may not have perceived that this action could result in decedent getting stabbed in the leg and dying as a result. In support, appellant cites *Hunter v. State*, 647 S.W.2d 657 (Tex. Crim. App. 1983), and *Bodeker v. State*, 629 S.W.2d 65 (Tex. App.—Dallas, 1981, pet. ref'd). Both cases are distinguishable, however, and *Bodeker* is of questionable precedential value.

In *Hunter*, the Court of Criminal Appeals held that criminal negligence was raised when the evidence showed that the gun the defendant was holding had discharged as he swung it toward the back seat of a car to "hush" the decedent. 647 S.W. 2d at 657-59. The defendant in *Hunter* testified that he did not intend to fire the gun, had not cocked the gun, had never fired the gun before, did not know if it would even fire, and did not know why the gun discharged. *Id*. at 659. The Court concluded that this testimony was sufficient to raise "an issue as to whether appellant was negligent in not perceiving the risk which his conduct created." *Id*. Here, appellant did not testify and does not point to any evidence suggesting he did not know that brandishing a knife toward someone could result in the person being stabbed and dying. Moreover, the knife appellant was wielding in this instance was not capable of accidentally discharging as the defendant claimed the gun did in *Hunter*. *See Lewis v. State*, 866 S.W.2d 272, 276 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (distinguishing *Hunter* in a case involving a knife).

In *Bodeker*, the court of appeals concluded that criminal negligence was raised when testimony indicated the deceased was pushed through a doorway by a

13

group of people during a struggle and into a paring knife held by the defendant. 629 S.W.2d at 66. The Court of Criminal Appeals criticized the *Bodeker* opinion in *Mendieta* for failing "to detail the evidence which showed that the defendant ought to have, but did not, perceive a substantial and unjustifiable risk in his conduct." 706 S.W.2d at 652-53. In *Mendieta* itself, the Court of Criminal Appeals concluded that the defendant's testimony that he pulled out a knife and began swinging it to keep the decedent away from him actually showed an awareness of the risk he was creating, even though the defendant also said he did not mean to stab the decedent and the stabbing occurred when the decedent came at the defendant. *Id.* at 653; *see also Bergeron v. State*, 981 S.W.2d 748, 751-53 (Tex. Houston [1st Dist.] 1998, pet. ref'd) (holding evidence defendant merely tried to ward off complainant when he drew knife and stabbed complainant did not indicate appellant failed to perceive risk complainant might be seriously injured or killed as a result of defendant's use of the knife); *Wong v. State*, 745 S.W.2d 563, 565 (Tex. App.—Waco 1988, no pet.) (holding defendant's testimony that he grabbed a knife only to deter others from advancing did not show he was unaware of the risk created by his conduct).

**Conclusion.** This case is more similar to *Mendieta*, *Bergeron*, and *Wong* than it is to *Hunter* and *Bodeker*. Although appellant did not testify, his statements in the video recording that he wielded the knife to prevent decedent from kicking him down the stairs did not suggest that appellant was unaware of the risk created by his actions. Appellant does not cite any other evidence as suggesting he was unaware of the risk he was causing. Accordingly, appellant was not entitled to a charge instruction on the lesser-included offense of criminally negligent homicide. *See Meru*, 414 S.W.3d at 161. We overrule appellant's second issue.

14

We affirm the trial court's judgment.

/s/    Frances Bourliot
            Justice

Panel consists of Justices Wise, Bourliot, and Spain.

Do Not Publish — TEX. R. APP. P. 47.2(b).