

In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00136-CR
_____


QUINTONIOUS BERNARD GOLSTON, Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 102nd Judicial District Court
Bowie County, Texas
Trial Court No. 07F0376-102



Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

A fight between Joshua Rigsby and Quintonious Bernard Golston over Rigsby's alleged theft of Golston's wheel rims quickly escalated to the violent shooting death of thirty-year-old Donyelle Nelson. Golston was convicted of murder[1] and sentenced to a period of forty years' imprisonment. Because we find (1) the evidence is legally sufficient to support Golston's conviction and to support the jury's rejection of Golston's claim of self-defense, (2) the trial court did not err in failing to instruct the jury on the right of self-defense against multiple assailants, and (3) the trial court did not err in failing to permit Golston to inspect a statement referred to at trial, we affirm the judgment of the trial court.

## I. Rejection of Golston's Claim of Self-Defense—Sufficiency of the Evidence

Golston challenges the legal sufficiency of the evidence to support his conviction for murder. Although Golston concedes that he shot and killed Nelson, he contends his actions were justified based on a theory of self-defense; the jury was instructed on Golston's right of self-defense to the actions of Nelson. A jury's verdict of guilt is an implicit finding rejecting a theory of self-defense. *Zuliani v. State*, 97 S.W.3d 589 (Tex. Crim. App. 2003). Thus, Golston's challenge is to the legal sufficiency of the evidence supporting his murder conviction.

---

[1] TEX. PENAL CODE ANN. § 19.02(b)(1)–(3) (West 2011). In this case, Golston was indicted under subpart three of the statute. The indictment reads:

> Heretofore on or about <u>May 19, 2007</u>, [Golston] did then and there intentionally or knowingly commit or attempt to commit an act clearly dangerous to human life, to-wit: <u>point and fire a firearm at Donyelle Nelson</u> that caused the death of <u>Donyelle Nelson</u> and the said <u>Quintonious Bernard Golston</u> was then and there in the course of or immediate flight from the commission or attempted commission of a felony, to-wit: <u>Aggravated Assault with a Deadly Weapon</u>.

Golston complains the evidence at trial was legally insufficient to support this implicit finding because he conclusively established that he killed Nelson in self-defense. In resolving the sufficiency of the evidence issue, we must determine whether, after viewing all evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against Golston on the self-defense issue beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also* TEX. PENAL CODE ANN. § 2.03(d) (West 2011); *Jackson*, 443 U.S. 307; *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

We are directed to subject challenges to the legal sufficiency of the evidence to the hypothetically correct jury charge analysis. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).[2]

---

[2]The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. This standard

Turning to the sufficiency review, we review all of the evidence. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Because we must determine whether any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt as well as whether any rational trier of fact would have found against Golston on the self-defense issue beyond a reasonable doubt, these issues will be discussed together.

Five witnesses, including Golston, testified to the events resulting in Nelson's death in the early morning hours of May 19, 2007. While the stories vary in certain respects, some events are undisputed. On the evening preceding her death, Nelson, Tracoria Akkard, and Ladeana Hall visited the Big Easy Club. After that, the three friends went to the Esquire Club. While there, a fight broke out between Golston and Rigsby, whom Golston had accused of stealing his wheel rims. After club security moved the fight to the parking lot, Rigsby was kicked and beaten after having been thrown to the ground. In an attempt to protect Rigsby, Nelson covered Rigsby's body with her own.[3] Golston allegedly told Nelson to get up, or they would "stomp" her, too.[4] Nelson was kicked trying to protect Rigsby. She was beat up and angry.

After the altercation at the Esquire Club, Hall, Nelson, and Akkard drove to the Raceway gas station on State Line Avenue. At that time, Hall left with her boyfriend, and Shakiyah

---

ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime, rather than a mere error in the jury charge submitted. *Id.*

[3]Nelson and Rigsby were, at one time, a couple.

[4]Golston denies having made this statement, and claims that he was not part of any fight involving Rigsby outside of the club.

Moore[5] joined Nelson and Akkard. Rigsby also ended up at the Raceway parking lot, where he was approached by Nelson. She showed him her arm, which was swollen from being kicked. The same group of people then converged in the CITGO parking lot, just across the street from Raceway. Here is where the stories begin to diverge. Because the evidence breaks more or less evenly along the lines of conviction evidence and self-defense evidence, it will be presented in that manner.

### 1.  Conviction Evidence

Rigsby[6] testified that he left the Raceway parking lot with his friend, Charlton Brown, in Brown's car. They drove across the street to the CITGO parking lot, where Rigsby remained in the passenger seat. The next thing Rigsby knew, Golston was standing by the passenger side car window, pointing a gun in Rigsby's face. Golston continued to accuse Rigsby of stealing his rims; Rigsby told Golston to put the gun down and fight. At about that time, shots were fired across the street at the E-Z Mart. When Golston walked to the front of the car to locate where the shooting occurred, Brown exited the vehicle and went into the store. Rigsby also exited the vehicle, with the intention of taking the gun from Golston.

As Golston was walking back toward Rigsby, Akkard, Nelson, and Moore drove into the parking lot in an orange Cutlass. Nelson, in the backseat of Akkard's car, yelled out of the window, "Put the gun down and fight." At that point, Golston was holding the gun down at his side as he approached Rigsby. Moore then jumped out of the passenger side of the car and ran

---

[5]Moore passed away prior to trial.

[6]At the time of trial, Rigsby was imprisoned in Arkansas for theft.

around the back of the car, behind Golston. She hit him in the head with something that looked like a bottle. By that time, Nelson was getting out of the backseat, on the driver's side of the car (putting both Nelson and Moore on the same side of the car, behind Golston). After Moore hit Golston in the head, Golston turned completely around (now facing Moore and Nelson) and shot Nelson. After Nelson fell to the ground, it was apparent she had not survived the gunshot wound, the bullet having pierced her neck. Rigsby did not see Nelson do anything to cause Golston to shoot her.

After the shooting, Rigsby and Brown pursued Cory Phillips and Golston, who fled the scene in Phillips' car. They ultimately flagged down a police officer for help, and Golston was apprehended.

Brown testified largely along the same lines as Rigsby. Rigsby called Brown from the Raceway parking lot in the early morning hours of May 19, 2007, to tell Brown he had been "jumped." Brown met Rigsby at Raceway, and the two traveled across the street in Brown's car to CITGO. When they spotted Golston at CITGO, Golston pulled his gun and pointed it directly at Brown and Rigsby. When Brown told him they did not have a gun, Golston lowered the gun to his side.

As Brown was attempting to calm Golston, the "girls" (Akkard, Nelson, and Moore) pulled into the CITGO parking lot behind Golston. Moore approached Golston from the rear and hit him in the back of the head with a bottle. Nelson was standing between Moore and Akkard, behind Golston. After having been struck, Golston turned around and shot Nelson.

6

Golston and Phillips then jumped in their car and left. After having chased Golston, Brown and Rigsby flagged down a police officer, and Golston was apprehended.

### 2. Self-Defense Evidence

Akkard recalls that after she, Nelson, and Hall left the club, they traveled to the Raceway gas station. At that point, Hall left the group,[7] and Moore joined Nelson and Akkard. The three drove across the street to CITGO, with Akkard driving, Nelson in the passenger seat, and Moore in the backseat. When the group arrived at CITGO, Nelson jumped out of the car with a beer bottle Akkard brought from the club. Akkard did not see Nelson break the bottle, and is not sure if Nelson handed the bottle to Moore. Akkard did not see Golston holding a gun and does not know who shot Nelson.[8]

Phillips testified that after the altercation between Rigsby and Golston at the Esquire Club, he and a friend, Nicholas Cornelius, went to cruise State Line Avenue. They noticed cars at the CITGO station, so they pulled in. When Phillips got out of the car, he saw Golston and Rigsby having a conversation. As he approached, he did not see Golston holding a weapon. Phillips decided to leave, because Golston and Rigsby had ended their conversation.

---

[7]Hall was previously at the Esquire Club that night, and split an Ecstasy pill with Nelson. The two drank tequila at the club. When a fight broke out between Golston and Rigsby, Nelson tried to break it up. Security removed those causing the disturbance to the parking lot, where a circle of people gathered around Rigsby. Nelson was on top of Rigsby, trying to protect him from being kicked. Golston told Nelson that if she did not get up, they were going to stomp her, too. When Nelson refused to get up, she was kicked, also. They kicked her wig off, and she was beaten up and angry.

[8]Akkard testified that she was so intoxicated at the time of the incident, she could not remember much. At the time of trial, Akkard was serving prison time for aggravated assault with a deadly weapon and possession of a controlled substance.

7

As Phillips walked back to his car, he saw a Cutlass "fly" into the parking lot, with Akkard driving, Moore in the passenger seat, and Nelson in the backseat. As Nelson got out of the car, she broke a bottle on the ground and charged Golston, attempting to stab him. Golston's hand was cut as he blocked Nelson's attempted attack.[9] After Golston blocked the attempted frontal stab, Moore cut Golston in the back of the head with a file. As Golston was being attacked from behind by Moore, Golston's gun went off. At that point, Phillips[10] urged Golston to leave the scene.

Golston, who testified in his own defense, stated that he was carrying a gun on the night of Nelson's death because Rigsby stole his wheel rims, and he wanted to protect himself. Golston approached Rigsby at the Esquire Club, inquiring about his wheel rims. A fight soon erupted between the two, and the club "security guard" moved them outside. Golston was not part of any fight involving Rigsby outside the club.[11]

After leaving the club, Golston went to a friend's house and then drove to the CITGO station to "hang out." Shortly after he arrived at CITGO, Rigsby and Brown pulled into the parking lot, "mugging" him (looking him up and down). As Golston walked toward the car, he saw Rigsby reach under the driver's seat to get a gun. At that point, Golston pulled his gun out,

---

[9]This cut is documented in the medical evidence, and is unexplained but for this version of events. Dr. Marc McCrary is the emergency room physician at Wadley Regional Medical Center who treated Golston for a laceration to the back of his head, which required five staples. Golston also had an injury over the top part of one of his thumbs, about two centimeters long. McCrary testified that a broken bottle is a deadly weapon.

[10]At the time of trial, Phillips was incarcerated in Arkansas for "numerous things," including second degree battery.

[11]Golston had been friendly with Nelson almost all of his life; Nelson and Golston's mother were best friends. Golston denied telling Nelson that if she did not get off of Rigsby, he was going to stomp her, too.

cocked it, and held it to his side. He told Rigsby not to reach for the gun. Brown told Golston to put down the gun and fight.

Akkard then drove into the parking lot with Nelson in the passenger seat and Moore in the backseat. Nelson got out of the car, hit a bottle on the ground, and came toward Golston with the broken bottle in her right hand. Golston yelled at Nelson to wait, but Nelson kept coming. Golston feared for his life and raised his gun at Nelson.[12] Next, Golston felt a sharp pain in the back of his head, at which time he pulled the trigger, and Nelson fell to the ground. A friend of Golston put him in the car in order to take him to the hospital.

Officer Marc Sillivan of the Texarkana, Arkansas, Police Department Criminal Investigation Division, testified that Nelson's body was removed from the area where the blood is depicted in State's Exhibits. A beer bottle was broken in this area, and unless it was placed there by somebody, there is a "good chance" that Nelson was handling the top of that bottle (from which no fingerprints were taken).

Dr. Keith Pinckard, a medical examiner at the Southwestern Institute of Forensic Sciences, performed the autopsy on Nelson's body.[13] State's Exhibit 3 depicts a rim of soot deposition around the edges of the wound, which can indicate how close the muzzle of the gun

---

[12]In addition to the fact that he was being attacked, Golston was aware of Nelson's history of violence. Nelson had previously attacked a man named Cedric Fagan and stabbed him in the heart. Fagan testified that Nelson was his girlfriend in the fall of 2006. While quarreling, Nelson stabbed him in the chest, necessitating open heart surgery. No charges were brought against Nelson for the Fagan incident, as it was determined she was acting in self-defense.

Keitha Grant also testified to an incidence of violence involving Nelson. On Christmas Eve 2006, she and Nelson got into an altercation, and Nelson hit Grant repeatedly. Nelson then straddled Grant's back and slashed her across the forehead with a box cutter, the repair of which required twenty-five staples. Grant admitted to being addicted to crack cocaine.

[13]The autopsy showed that Nelson had a small amount of marihuana metabolite in her system, as well as methamphetamine and MDNA, also known as Ecstasy.

was to the victim when the gun was fired. As a general rule, soot deposition is seen when the muzzle is within a foot of the victim when the gun is fired. Here, Pinckard testified he believed the muzzle to be not more than a foot from Nelson when Golston pulled the trigger.

### 3.   Jury Resolution of Conflicting Evidence

Golston maintains this evidence clearly shows he was attacked before responding with deadly force. The testimonial evidence supporting this claim was provided by Golston, Phillips, and, to a lesser extent, Akkard. Evidence that Golston suffered a cut to his hand and a cut to the back of his head as a result of the incident was uncontroverted. A broken bottle, capable of being used as a deadly weapon, was recovered from the scene. Moreover, the evidence indicated Nelson had been drinking alcohol and using drugs before the shooting, and there was a "good chance" she was holding the bottle used to cut Golston. This evidence satisfies Golston's burden to produce some evidence that supports his claim of self-defense. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913. However, the State has the ultimate burden of persuasion when confronted with a claim of self-defense. *Zuliani*, 97 S.W.3d at 595. The burden of persuasion requires the State to prove its case beyond a reasonable doubt. *Id.* at 594.

At the time of the shooting, Golston was a convicted felon in possession of a firearm. Phillips was incarcerated at the time of trial for second degree battery, among other things, and Akkard was serving prison time for aggravated assault with a deadly weapon and possession of a controlled substance. Each of these witnesses was impeached with these prior felony convictions.

10

The jury is the sole fact-finder and judge of witness credibility. As such, it was within the province of the jury to disbelieve the defensive testimony offered by Akkard, Golston, and Phillips.[14] *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). Conversely, the jury was free to believe the testimony offered by Rigsby and Brown, which indicated Golston turned and shot Nelson, who was standing behind him. Nothing in the testimony offered by these witnesses tended to indicate Nelson attacked Golston or otherwise caused Golston to reasonably believe that his life or person was in danger from the use of unlawful deadly force at the hands of Nelson.

Moreover, this testimony is not inconsistent with that of Pinckard, i.e., that the muzzle of the gun was not more than a foot from Nelson at the time she was shot. Neither is this testimony inconsistent with that of Sillivan, who opined that there was a "good chance" Nelson was handling the top of that bottle found at the scene. Even assuming Nelson handled the bottle at some point,[15] there was testimony to indicate Moore actually struck Golston with the bottle. Brown testified that Nelson had nothing in her hands when she was shot. The jury's verdict of guilt was an implicit rejection of Golston's claim of self-defense. *Zuliani*, 97 S.W.3d at 594. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt the elements of murder, and also could have found, beyond a reasonable doubt, against the claim of self-defense. *See Saxton*, 804 S.W.2d at 914.

---

[14]Phillips testified that he has known Golston since he was a child and would put his life on the line for Golston. Phillips gave a statement to Detective Brown (now deceased) a week after the shooting. At trial, Phillips claimed the statement was coerced. The statement was not introduced at trial, and it is not in the record.

[15]There is no fingerprint analysis to confirm this.

11

**II.    Failure of Trial Court to Sua Sponte Instruct the Jury on the Right of Self-Defense Against Multiple Assailants**

Although the trial court charged the jury on self-defense as to Golston, a jury charge on self-defense against multiple assailants was neither requested nor given.[16]  Golston complains that even though he did not object to this omission from the court's charge, he suffered egregious harm as a result of the failure to include this instruction, and thus the case should be reversed and remanded for a new trial.

In analyzing a jury charge issue, we first determine if error occurred and, if so, we conduct a harm analysis.  *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  An erroneous or incomplete jury charge does not result in automatic reversal.  *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Instead, the appellate court "must determine whether sufficient harm resulted from the error to require reversal."  *Id.* at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *reaffirmed by Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).[17]

---

[16]Golston argues there was evidence he was attacked by both Nelson and Moore, and was thus entitled to a jury instruction on the right of self-defense against multiple assailants.

[17]The level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error.  *Abdnor*, 871 S.W.2d at 732.  When a proper objection is made at trial, reversal is required if the error is "calculated to injure the rights of defendant"—the appellant need only demonstrate "some harm" on appeal.  *Id.*; *see also Almanza*, 686 S.W.2d at 171.  When charge error is unpreserved, reversal is required only when "the error is so egregious and created such harm that he 'has not had a fair and impartial trial'--in short 'egregious harm.'"  *Almanza*, 686 S.W.2d at 171; *see Rudd v. State*, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet. ref'd).  "Egregious harm" results from errors affecting the very basis of the case or that deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive.  *Ngo*, 175 S.W.3d at 750; *Boones v. State*, 170 S.W.3d 653, 660 (Tex. App.—Texarkana 2005, no pet.).

12

Golston maintains a charge on the right of self-defense against multiple assailants is required when there is evidence, viewed from the defendant's standpoint, that he was in danger of an unlawful or threatened attack at the hands of more than one assailant, citing *Frank v. State*, 688 S.W.2d 863 (Tex. Crim. App. 1985). Because the evidence here supports such a defense, Golston argues, the error was automatic and the harm was egregious.

In *Frank*, the defendant was adjusting the wheels on a lawn mower when two assailants ran through the gate to his yard. The evidence raised the issue of self-defense from multiple assailants, but the trial court erroneously refused the requested instruction. *Frank* is distinguished from this case because the defensive instruction was requested and rejected. Here, Golston did not request an instruction on the right of self-defense from multiple assailants.

In reliance on *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998), the State maintains that in order to complain about the omitted defensive issue on appeal, Golston was required to request an instruction on the right of self-defense against multiple assailants, or to otherwise object to the charge. While *Posey* did not involve an instruction on the right of self-defense against multiple assailants, its holding applies to "defensive issues."

*Posey* was a car theft case in which Posey claimed for the first time on appeal that the trial court reversibly erred by not sua sponte instructing the jury on the defense of mistake of fact. *Id.* at 59. Posey did not request this instruction and did not object to the absence of this instruction in the jury charge. The court of appeals applied the *Almanza* harm analysis, and reversed, finding Posey was egregiously harmed because the jury was precluded from considering his mistake of fact defense. *Id.* at 59–60.

13

The Texas Court of Criminal Appeals reviewed *Posey* to decide whether "*Almanza* applies to the omission in the jury charge of defensive issues that have not been properly preserved by a defendant's request or objection." *Id*. at 60. The court determined that Article 36.14 of the Texas Code of Criminal Procedure[18] does not require the trial court to sua sponte instruct the jury on unrequested defensive issues, reasoning that a contrary ruling could impose on defendants unwanted defensive issues in the charge. *Id*. at 62–63. The question of whether to include a defensive issue is a strategic decision "generally left to the lawyer and the client." *Id*. at 63; *see also Bennett v. State*, 235 S.W.3d 241, 243 (Tex. Crim. App. 2007) (request for jury instruction on self-defense did not preserve request for instruction on defense of third person).

More recently, in *Delgado v. State*, 235 S.W.3d 244 (Tex. Crim. App. 2007), it was determined that an instruction on reasonable doubt at the guilt/innocence stage of the trial must be included only when requested by the defendant. *Id*. at 247–48. The court reasoned that in some circumstances, a limiting instruction "would serve only to remind the jury of what it has heard or to re-emphasize the evidence in the minds of the jurors, and perhaps to suggest to the jury a use for the evidence which is best left unmentioned." *Id*. at 250 n.25 (quoting 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 41 at 221–22 (2d ed. 1994)). The court quoted with approval the following excerpt from the Dix and Dawson treatise on Texas Criminal Practice and Procedure:

> Because of the strategic nature of the decision, it is appropriate for the trial court to defer to the implied strategic decisions of the parties by refraining from submitting lesser offense instructions without a party's request. It is clear that the

---

[18]TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007).

defense may not claim error successfully on appeal due to the omission of a lesser included offense if the defense refrained from requesting one. Likewise, any error in the improper submission of a lesser included instruction is waived if the defense fails to object to the instruction.

*Id.* at 250.

In *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010), the appellant asserted trial court error in refusing to submit a jury instruction concerning mistake of fact based on his "paranoid ideations and psychotic delusions," because he may have believed the deputies he killed were not acting in the discharge of their official duties. *Id.* at 382. In determining appellant was not entitled to such an instruction, because he failed to advise the trial court of what specific fact of which he was mistaken, the court recognized that

> [t]he purpose of the *Posey* rule is to prevent a party from "sandbagging" the trial judge by failing to apprise him, and the opposing party, of what defensive jury instructions the party wants and why he is entitled to them.

*Id.* at 383; *see also Tolbert v. State*, 306 S.W.3d 776, 780 n.6 (Tex. Crim. App. 2010) ("Our decision in *Posey* was intended 'to discourage parties from sandbagging or lying behind the log' and to discourage a defendant from retrying the case on appeal under a new defensive theory, effectively giving the defendant 'two bites at the apple.'"). "Under *Posey*, a party can forfeit the right to complain about the omission of a defensive issue because the defensive issue must be requested before the trial court has a duty to place it in the charge." *Williams v. State*, 273 S.W.3d 200, 223 (Tex. Crim. App. 2008).

A trial court must submit a charge setting forth the "law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). "The purpose of the jury charge . . . 'is to

15

inform the jury of the applicable law and guide them in its application to the case.'" *Delgado*, 235 S.W.3d at 249. "It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* However, "it does not inevitably follow that [the trial judge] has a similar sua sponte duty to instruct the jury on all potential defensive issues, lesser-included offenses, or evidentiary issues," which frequently depend upon trial strategy and tactics. *Id.*

Because an instruction on self-defense against multiple assailants is a defensive issue, and because Golston failed to request a submission of this defensive issue, the trial court had no duty to place it in the charge. Accordingly, the trial court did not err in failing to instruct the jury on this defensive issue.

## III. Failing to Permit Golston to Inspect Statement

Texarkana Police Detective Greg Vickers testified he investigated Nelson's stabbing of her boyfriend, Fagan. The investigation included an interview with Nelson and with Fagan. Vickers recommended that the case against Nelson be dropped because, in his opinion, Nelson acted in self-defense. When asked what was crucial in terms of making that decision, Vickers responded that Nelson claimed to have acted in self-defense, and Fagan's report of the stabbing was almost identical to Nelson's version. Further, Fagan allegedly told Vickers "that he attacked Ms. Nelson and tried to take the knife away." When Vickers testified on cross-examination that

16

he had this statement on videotape, defense counsel requested the opportunity to listen to the tape.[19]

The trial court ruled that the tape could not be played before the jury because it "adds nothing to this in light of the fact that the individual [Fagan] has testified as to what happened. And again, you know, the defendant had knowledge of it." On appeal, Golston complains the taped statement was subject to his review[20] under the "use before the jury" rule or Rule 611 of the Texas Rules of Evidence. *See* TEX. R. EVID. 611.

## A.    Preservation of Error

The State contends Golston failed to preserve error with respect to his third appellate point. The State characterizes Golston's complaint on appeal as merely not being permitted to inspect the videotape, whereas, at trial, Golston only objected to not being permitted to admit the tape in evidence. The State thus claims Golston's complaint on appeal does not comport with the objection made at trial.

True, the objection raised on appeal must be the same as the objection raised at trial. TEX. R. APP. P. 33.1(a); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (holding nothing preserved for review if objection at trial does not comport with issue on appeal); *Duren v. State*, 87 S.W.3d 719 (Tex. App.—Texarkana 2002, pet. struck). However, Golston's brief

---

[19]The first mention of the tape was made during cross-examination. Counsel for Golston acknowledged that he had discovery documents from the State, including the officer's report which stated that such a tape existed.

[20]The trial court told defense counsel that "it matters not to me whether you listen to it or not. . . . But I'm not going to display it before a jury.

fairly includes a complaint about two issues—in not allowing Golston to inspect the tape and possibly introduce it to undermine Vickers' credibility.

At trial, defense counsel asked to be permitted to take a break in order to listen to the tape. Defense counsel further argued, "It's a credibility issue, and now we're leaving this impression that Donyelle Nelson had the ability to take a knife and stab him to defend herself." When the trial court indicated that the tape "adds nothing to this in light of the fact that the individual has testified as to what happened," defense counsel responded, "So you're denying my request for the officer to get the tape out of his truck . . . so it may be listened to by me." After the trial court stated that defense counsel would not be permitted to display the tape before the jury, defense counsel asked the trial court to note his objection "that you're not allowing me to have the tape to display in front of the jury."

In essence, defense counsel was asking to listen to the tape in order to make a determination of whether to attempt to introduce it into evidence. The trial court determined that whether or not defense counsel listened to the tape, it would not be introduced into evidence. The complaint on appeal is the same as that made in the trial court. Error was preserved.

18

**B. Neither the "Use Before the Jury" Rule nor Rule 612 Apply**

Golston relies on the "use before the jury" rule as articulated in *Hoffpauir v. State*[21] to support his contention that he was entitled to inspect the tape.[22] This rule entitles a defendant to "inspect, upon timely request, any document, instrument or statement" that the State uses "before the jury" in a manner that its contents become an issue. *Id.* at 141. The definition of "use before the jury" includes

> showing a document to a witness who is on the stand, permitting a witness to identify a document, or reading portions of a document aloud to a jury. But counsel for the State must in some way inform the witness that the document or statement is being referred to during the examination.

*Id.* (citations omitted). This rule focuses on the use to which the writing is put—that is, unless the instrument is actually used in the presence of the jury by the State—the rule is inapplicable. *Id.*; *Bynum v. State*, 767 S.W.2d 769, 782 (Tex. Crim. App. 1989); 25 Tex. Jur. 3d Criminal Procedure: Trial § 1081.[23]

Here, no part of Fagan's recorded statement was shown to a witness or read aloud to the jury. Moreover, the State never mentioned the recorded statement in front of the jury; rather, testimony regarding the statement was elicited on cross-examination. Because no part of this statement was used by the State in the presence of the jury, the "use before the jury rule" does not apply. *See Mendoza v. State*, 552 S.W.2d 444, 448 (Tex. Crim. App. 1977) (rule comes into

---

[21]596 S.W.2d 139 (Tex. Crim. App. [Panel Op.] 1980).

[22]While Golston was never told he could not inspect the tape, the trial court eliminated the benefit of such inspection by ruling the tape could not be admitted.

[23]The "use before the jury rule" has now largely been codified in TEX. R. EVID. 106 (introduction of the remainder of related writings or recorded statements) and TEX. R. EVID. 107 (the rule on optional completeness).

19

play only through State's use of document or statement at trial); *see also Skinner v. State*, 956 S.W.2d 532, 540 (Tex. Crim. App. 1997) (testifying about topics addressed in document does not place document within meaning of phrase "use before the jury"). We further note that defense counsel was aware of the existence of the recorded statement prior to trial. If counsel believed the statement was an important aspect of discovery, the prudent course would have been to seek access to the tape prior to trial.

Alternatively, Golston maintains the statement was subject to inspection and admission under Rule 612 (even though Golston refers to Rule 611 in his brief, it is apparent from the substance that he is relying on Rule 612—dealing with a writing used to refresh a witness' memory).

In *Davis v. State*, 93 S.W.3d 664 (Tex. App.—Texarkana 2002, pet. ref'd), this Court held that under Rule 612, counsel was entitled to review a document utilized by a witness to refresh her memory before testifying. *Id.* at 669. Here, Vickers did not refer to the recorded statement during trial, and never indicated he utilized the statement to refresh his memory before testifying. Accordingly, Rule 612 is not applicable, and Golston was not entitled to invoke its benefits.

## IV.   Conclusion

We affirm the judgment of the trial court.


Jack Carter
Justice

Date Submitted:     June 21, 2012
Date Decided:       June 29, 2012

Do Not Publish