**Opinion issued July 31, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00478-CR

———————————

**TROY WAYNE MCDADE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 208th District Court**
**Harris County, Texas**
**Trial Court Case No. 1328311**

---

### MEMORANDUM OPINION

A jury convicted appellant Troy Wayne McDade of murder, finding that he used a deadly weapon, namely a firearm, in the commission of the crime. *See* TEX. PENAL CODE ANN. § 19.02 (West 2011). The court assessed punishment at 16 years

in prison, and McDade appealed. In a single issue, he contends that the trial court erred by refusing to charge the jury on the lesser-included offense of deadly conduct.

We affirm.

## Background

Troy Wayne McDade lived in Hockley around the corner from his godmother and near other relatives including aunts, uncles, and cousins. Because his mother was deceased, McDade was especially close to his godmother, and he regarded his cousins as siblings. Beside his house was a shed in which McDade kept tools and a shotgun, which he testified he received as collateral for a personal loan he made to a man who was not identified at trial. McDade testified that the shed was not fully enclosed; rather, it could be accessed through one corner by simply lifting a metal flap.

Michael Roy Hester also lived in the neighborhood. His sister and other witnesses testified that he was an alcoholic with a reputation for violence. He carried a cane, but the evidence was disputed as to whether he relied on the cane to enable him to walk or if he carried it to threaten people and neighborhood pets. At trial several witnesses testified that he was something of a vagrant, staying in abandoned homes or with friends or relatives, occasionally doing odd jobs for money, and relying on the generosity of his neighbors for food, clothing, and

2

material goods. Nevertheless, Hester was part of the neighborhood community, and McDade testified that Hester was his friend and someone he had frequently helped.

One Friday night in November 2011, after working a twelve-hour day shift, McDade and his then-fiancée Samantha Shepard went to a birthday party for McDade's uncle. McDade testified that he was there for approximately six or eight hours, until the early morning, and that he drank approximately three or four beers during that time. Hester also attended the party, and he became intoxicated, taunting McDade and others by saying that he was their father. McDade testified that Hester had been telling him that for years. In the early morning before sunrise, McDade's uncle asked him to take Hester home, and McDade and Shepard left the party with Hester. McDade testified that he did not mind giving Hester a ride because it was raining and he had no reason to fear Hester at that time.

Shepard drove because she had not been drinking alcohol. McDade sat in the front passenger seat and Hester sat in the rear passenger seat of Shepard's truck. Shepard testified that she heard a heated discussion between the two men but did not hear specifically what they were talking about.

At the time, Hester was staying in an abandoned house near the house McDade shared with Shepard. When they arrived at the house where Hester was staying, he refused to get out of the truck. Shepard drove to the house she shared with McDade, which was approximately a block away, parked, and went inside

3

with a plate of leftovers from the party. Hester continued to refuse to leave the truck. McDade pulled him from the truck and handed him his cane. McDade reached inside the rear of the truck to grab another plate of leftover food.

According to McDade, Hester then hit him over the head with either his fist or an object, causing him to bleed profusely. He testified that Hester was threatening him verbally and coming toward him. McDade went to his shed, which was a few feet away, reached under the metal flap, and grabbed the shotgun. He shot it twice into the air as a warning and told Hester to leave. McDade testified that blood from his head injury was in his eyes, running down his forehead and onto his clothes. According to McDade, despite the warning shots into the air, Hester "kept advancing" toward him, so he "lowered the weapon" and "pulled the trigger."

McDade said Shepard came out of the house after the last shot was fired. Shepard testified that she stepped out of the house just as the third shot was fired, and she saw Hester fall to the ground. Shepard called 9-1-1, and she spoke to Hester, who was breathing but unresponsive. He later died. Meanwhile, McDade called his godmother, hid the shotgun in a field near his house, and then went inside to wash his hands and care for his still-bleeding wound.

The police brought both Shepard and McDade to the police station for questioning. Both initially fabricated accounts of the events of that evening. But

4

upon further questioning, Shepard told the police what McDade had done. Similarly, McDade initially denied any involvement but later admitted shooting and killing Hester both in his statement to police and in his testimony at trial.

At trial, the State presented forensic DNA evidence that showed samples of blood on the jeans McDade was wearing at the time of the shooting matched his own DNA, and one bloodstain matched Hester's. The medical examiner described Hester as thin, weighing 147 pounds at 5 feet 8 inches tall. He was heavily intoxicated at the time of the shooting, with a blood alcohol content of 0.30. He suffered from natural diseases including cirrhosis of the liver and pulmonary emphysema, which would not have been fatal. More notably, the medical examiner testified that her findings regarding the gunshot wound were consistent with Hester being shot with a shotgun from a distance of two-and-a-half to four feet away. She said he died from the gunshot wound and that any person would have died from the gunshot wound in this case, regardless of his underlying health.

The court admitted the videorecording of McDade's statements to police, and it was played for the jury. McDade initially described the events of the night, including his whereabouts before he went to his uncle's party. He first said that he dropped off Hester after the party, went home, and later heard gunshots outside his house. He said he saw Hester lying on the ground and told Shepard to call 9-1-1. He denied owning a shotgun and insisted that he did not fire a gun that night.

One of the officers made reference to a gunshot residue test performed on McDade's hands and told him that he knew he had lied about something. He said he knew that Hester had said some things that angered McDade. The officer said he had no doubt that McDade had shot Hester, but he did not think McDade had planned to do so. At that point, McDade's story changed. He admitted that he owned a shotgun, which he said he kept outside because items had been stolen from his truck. McDade told the officer that Hester hit him on the head. After that, while bleeding from the wound, he grabbed the shotgun from his shed and fired a couple of warning shots while trying to evade Hester who was still approaching. He said:

> I shot him like three times I think it was.
>
> . . . .
>
> I did do it. I'm not denying it. I feel real bad.
>
> . . . .
>
> I did it. I did it. I didn't mean to do it.
>
> . . . .
>
> I ain't denying it. I did it.

At trial, McDade's testimony varied in some respects from the recorded statement he gave to the police. He testified that on the way home from the party, Hester had repeatedly asked him for money and a ride to another location where he could buy crack cocaine. McDade said he refused the requests. He said that Hester

hit him on the head and that the wound bled profusely. He testified that he did not

want Hester to die and did not intend to kill him:

> My intention wasn't to shoot him. I was just trying to scare him away for—just for him to leave, and I didn't want to be hit because he had draw[n] blood, and I didn't know what he had on his mind for him to pull something like that.
>
> . . . .
>
> My purpose wasn't to shoot Michael Roy Hester. I just actually wanted to scare him. I was stern [sic], I was scared, and I really was trying to, I guess, keep that away from my mind because I realized that, you know, I had no choice. I was only protecting myself because I felt if—I felt threatened, you know, and I thought he would do something else to me so . . . I didn't want to shoot him. I—I wasn't doing it on purpose. . . . I was only protecting myself because I felt threatened.

But he admitted that he in fact shot and killed Hester:

> State: I'll ask you again: Are you telling this jury that you did in fact kill Michael Hester?
>
> McDade: Yes, ma'am.
>
> State: And, I mean, you're saying it's self-defense so you have to at least start with the point . . . that you did it; right?
>
> McDade: Yes, ma'am.
>
> . . . .
>
> State: Now, I mean, you pulled the trigger; didn't you?
>
> McDade: Yes, ma'am.
>
> State: It didn't just fall and discharge? We're not talking about an accident; right?

McDade:     No, ma'am, it didn't fall.

State:      Okay. So the gun goes off because you pull the trigger and shoot him; right?

McDade:     Yes, ma'am.

At the charge conference, McDade's attorney requested an instruction on deadly conduct, specifically, "if he knowingly discharges a firearm at or in the direction of one or more individuals." The trial court denied the request, saying, "I just don't think—because of his testimony, I don't think it fits the mold of what we're talking about. I think it's either murder or self-defense, one or the other."

The jury was charged on murder and self-defense. The court's charge instructed the jury to find McDade "guilty of murder, as charged in the indictment" if it found that McDade either (1) "unlawfully, intentionally or knowingly cause[d] the death of Michael Hester, by shooting Michael Hester with a deadly weapon, namely, a firearm," or (2) "unlawfully intend[ed] to cause serious bodily injury to Michael Hester, and did cause the death of Michael Hester by intentionally or knowingly committing an act clearly dangerous to human life, namely, shooting Michael Hester with a deadly weapon, namely, a firearm." The jury found McDade guilty.[1] The trial court later sentenced him to 16 years in prison, which is within

---

[1]     The court's charge set forth the law of self-defense, and it instructed the jury to acquit or find McDade not guilty if it found that his actions were justified or if it had a reasonable doubt as to whether McDade was acting in self-

the statutory range of punishment for a first-degree felony of 5 to 99 years or life in prison.

**Analysis**

In a single issue on appeal, McDade argues that the trial court erred by failing to instruct the jury on the lesser-included offense of deadly conduct. Specifically, he argues that his testimony that he did not intend to kill Hester and that he was feeling the effects of a blow to his head at the time of the shooting demonstrate that he acted recklessly not intentionally.

The Texas Code of Criminal Procedure provides, "[i]n a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense." TEX. CODE CRIM. PROC. ANN. art. 37.08 (West 2014).

An offense is a lesser-included offense if:

> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

defense. This portion of the charge is not contested on appeal. The jury rejected the self-defense argument.

9

> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

*Id.* art. 37.09.

We employ a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser-included offense. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012); *Sweed v. State*, 351 S.W.3d 63, 67 (Tex. Crim. App. 2011); *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007). The first step is a question of law, in which the court compares the elements alleged in the indictment with the elements of the lesser offense to determine "if the proof necessary to establish the charged offense also includes the lesser offense." *Cavazos*, 382 S.W.3d at 382. "The second step of the lesser-included-offense analysis is to determine if there is some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense." *Sweed*, 351 S.W.3d at 67–68. Because this fact question depends on the evidence presented at trial, we review the entire record in making this determination on appeal. *See id.*; *Hayward v. State*, 158 S.W.3d 476, 478–79 (Tex. Crim. App. 2005). Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a jury instruction on a lesser-included offense. *Hall*, 225 S.W.3d at 536 (citing *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). "Although this threshold showing is low, 'it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather,

10

there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted.'" *Sweed*, 351 S.W.3d at 67–68 (quoting *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)). "[T]he standard may be satisfied if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations." *Sweed*, 351 S.W.3d at 68.

The indictment in this murder case alleged that McDade "intentionally and knowingly caused the death of MICHAEL HESTER . . . by SHOOTING [HESTER] WITH A DEADLY WEAPON, NAMELY, A FIREARM," and in the alternative that he "did then and there unlawfully intend to cause serious bodily injury to MICHAEL HESTER . . . and did cause the death of [HESTER] by intentionally and knowingly committing an act clearly dangerous to human life, namely, BY SHOOTING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY, A FIREARM." The offense of deadly conduct can be committed in two ways that are relevant to this case. *See* TEX. PENAL CODE ANN. § 22.05 (West 2011). In the first way, a person commits the offense of deadly conduct if he "recklessly engages in conduct that places another in imminent danger of serious bodily injury." *Id.* § 22.05(a). This is a Class A misdemeanor. *Id.* § 22.05(e). In the second way, a person commits the offense of deadly conduct if he "knowingly

discharges a firearm at or in the direction of . . . one or more individuals." *Id.* § 22.05(b). This is a third-degree felony. *Id.* § 22.05(e).

At trial, McDade requested a jury instruction as to felony deadly conduct, but on appeal he argues only about his entitlement to an instruction as to misdemeanor deadly conduct. Misdemeanor deadly conduct has a less culpable mens rea—recklessness—than murder. However, the proof that McDade caused Hester's death by shooting him with a firearm would necessarily constitute proof that he engaged in conduct that placed Hester in danger of serious bodily injury. *See id.* § 22.05(a); *Ford v. State*, 38 S.W.3d 836, 845 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Accordingly, we conclude that misdemeanor deadly conduct is a lesser-included offense of murder and that the first step of our inquiry into whether a jury instruction was warranted is satisfied.[2] *See* TEX. CODE CRIM. PROC. ANN. art. 37.08 (West 2011); *Cavazos*, 382 S.W.3d at 382; *see also Daniels v. State*, 313 S.W.3d 429, 432 (Tex. App.—Waco 2010, pet. ref'd); *Ortiz v. State*, 144 S.W.3d 225, 232–34 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

We next consider the second step of our inquiry: whether there is a scintilla of evidence that McDade is guilty, if at all, of only misdemeanor deadly conduct and not murder. *See Sweed*, 351 S.W.3d at 67–68. McDade argues that his

---

[2]    Although not argued on appeal, the same proof needed to show that McDade caused Hester's death by shooting him with a firearm would necessarily constitute proof that he knowingly discharged a firearm at or in the direction a person. *See* TEX. PENAL CODE ANN. § 22.05.

12

testimony that he did not intend to shoot Hester and that he was feeling the effect of his head wound when he fired the shotgun show that his actions were merely reckless. However, McDade's theory of the case was that he acted in self-defense. He admitted shooting Hester in his police interview, which was played for the jury, and in his trial testimony. The prosecutor emphasized this by asking him, "[Y]ou're saying it's self-defense so you have to at least start with the point . . . that you did it; right?" to which McDade answered, "Yes, ma'am." But "one cannot accidentally or recklessly act in self-defense." *See Martinez v. State*, 16 S.W.3d 845, 848 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *see also Alonzo v. State*, 353 S.W.3d 778, 782 (Tex. Crim. App. 2011). Intentional conduct is implicit in claim of self-defense. *See Martinez*, 16 S.W.3d at 848; *see also Alonzo*, 353 S.W.3d at 782. Thus, McDade's testimony alone would not be sufficient to show that he was guilty only of deadly conduct. Rather, for the jury to find that he committed only deadly conduct it would have to disbelieve the evidence that he acted intentionally, which supports both the greater offense and his self-defense argument. This would not satisfy the second prong of our inquiry or entitle McDade to a jury instruction on deadly conduct as a reckless act. *See Sweed*, 351 S.W.3d at 67–68. Accordingly, we hold that the trial court did not err by not instructing the jury on the lesser-included offense of misdemeanor deadly conduct. We overrule McDade's sole issue.

**Conclusion**

We affirm the judgment of the trial court.


                                        Michael Massengale
                                        Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish.   TEX. R. APP. P. 47.2(b).