

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

## NO. PD-1233-19

---

## ANTHONY RASHAD GEORGE, Appellant

## v.

## THE STATE OF TEXAS

---

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE FIFTH COURT OF APPEALS DALLAS COUNTY

---

**SLAUGHTER, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

Appellant was convicted of capital murder in the course of a robbery. One of the possible theories of Appellant's liability for capital murder was a conspiracy theory under Penal Code Section 7.02(b) for an offense committed by a co-conspirator. Such liability lies if the murder was committed in furtherance of the robbery and should have been

anticipated as a result of carrying out the conspiracy.[1]

The facts at trial showed that Appellant and three others entered into an agreement to rob the victim in his hotel room. The victim was later found dead in his hotel bed, having been severely beaten, bound, and left unconscious lying face-down in a pool of his own blood. On direct appeal, Appellant challenged the trial court's refusal of a jury instruction on the lesser-included offense of robbery. He argued that testimony from two of his co-conspirators suggested that he did not participate in the beating and only intended to rob the victim. Based on this evidence, he argued that the jury could have rationally concluded that he should not have anticipated the murder and, therefore, robbery was a valid alternative to the charged offense.

In upholding the refusal of the lesser-included-offense instruction, the court of appeals appeared to create a bright-line rule applicable to conspirator-liability capital-murder-in-the-course-of-a-robbery cases. It stated that "when one decides to steal property from another, he should anticipate he or his co-conspirator might be confronted by that individual and that his co-conspirator might react violently to that confrontation." *George v. State*, No. 05-18-00941-CR, 2019 WL 5781917, at *6 (Tex. App.—Dallas Nov. 6, 2019) (mem. op., not designated for publication). Appellant now challenges the court of appeals' decision.

---

[1] *See* TEX. PENAL CODE § 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.").

We reject the applicability of this type of bright-line rule. The proper analysis for the issue at hand involves an assessment as to whether a jury could rationally find the defendant guilty only of robbery. For the jury to make such a finding, there had to be evidence refuting or negating the anticipation element for conspirator-liability showing that the defendant should not have anticipated the murder. Identifying whether such evidence exists in the record necessitates an examination of the specific facts. That, therefore, makes a bright-line rule in this context inappropriate. We agree, however, with the court of appeals' ultimate conclusion that Appellant was not entitled to a lesser-included-offense instruction on robbery based on the particular facts presented here. The record contains no evidence that rationally refutes the conclusion that Appellant should have anticipated the victim's murder, and the totality of the circumstances objectively show that the murder was reasonably foreseeable. Therefore, robbery was not a valid, rational alternative to the charged capital murder. We affirm the court of appeals' judgment upholding the trial court's denial of the requested robbery instruction.

## I. Background Facts

Appellant served as a pimp for prostitute Rachel Burden and was the boyfriend of prostitute Jessica Ontiveros.[2] On November 27, 2016, Burden and Ontiveros had three

---

[2] Ontiveros testified that Appellant was her boyfriend but not her pimp. He did sometimes drive Ontiveros to her appointments, and she gave him money to pay her bills, but otherwise, Ontiveros managed her own business. Burden, however, testified that Appellant was also Ontiveros' pimp and had control over both of their lives. She stated that both she and Ontiveros had to follow Appellant's rules and do as he instructed. One such rule was that when Appellant had his friends around, Burden and Ontiveros could not look at them and usually had to go to another room. Burden further testified that she was afraid of Appellant.

successive "appointments" with victim Brian Sample in his hotel room at the Le Meridien in Dallas.[3] Sample had just received a large insurance settlement and hired Burden and Ontiveros to "party" with him. Sample's partying included consuming alcohol and various drugs, including methamphetamine, cocaine, and GHB.[4]

After the first appointment with Sample, which occurred very early in the morning, Ontiveros left the hotel to meet another client and Appellant picked up Burden. Later that day, Ontiveros and Burden returned to Sample's hotel room for a second appointment. At the end of this second appointment, Sample gave Burden his room key so that she and Ontiveros could come back later. Appellant picked up both women to take them back to the apartment he shared with Ontiveros. At some point, the women informed Appellant that Sample had paid them in hundred-dollar bills retrieved from the safe in the hotel room's closet. Burden told Appellant that she believed Sample had about $8,000 more in there.[5] This information led Appellant to formulate a plan to rob Sample.

A short time later, Sample invited the women back for a third appointment. When they arrived, according to Ontiveros, Sample was acting "paranoid" and "crazy" and his behavior had become erratic.[6] After Ontiveros and Burden entered the room, Sample locked the door and pulled a dresser in front of it. Burden told Sample that she needed to

---

[3] Appellant drove Burden and Ontiveros to and from most of these appointments.

[4] Ontiveros described GHB as a "liquid date rape" drug.

[5] Ontiveros testified that Burden was known to occasionally rob her clients. Burden, however, denied this allegation at trial.

[6] Burden's testimony confirmed that Sample's behavior was paranoid and erratic, but that he was "manageable."

make a phone call, so he moved the dresser and she left. On her way out of the hotel, Burden saw Appellant entering the building. Appellant was also seen on the hotel's surveillance video entering with a large man later identified as Rodney Range. Appellant had changed clothes from his earlier trips driving the women to and from the hotel. He had previously been wearing a white shirt, jacket, black pants, and "slides" (a type of backless sandal) but was now wearing a black hoodie, black pants, black tennis shoes, and black leather gloves. He also parked further away from the hotel, and off the hotel's property. Previously, Appellant had parked right by the hotel when dropping off or picking up the women. Range, however, drove separately and parked his car next to the hotel. Upon seeing Burden, Appellant instructed her to walk up the street. Burden testified that she knew Appellant was on his way to rob Sample. She texted Appellant telling him to "be careful" and advised him to take the phone cords from the hotel room, presumably so that Sample could not call for help. Burden also texted Ontiveros to let her know that Appellant was on his way up to the room and told Ontiveros to check the closet for money and to take the phone cords.

Meanwhile, Ontiveros and Sample were still in Sample's room together. Based on Sample's "crazy" and erratic behavior, Ontiveros testified that she was afraid of him. She convinced Sample to undress thinking that if he was naked, he would not chase her if she tried to leave.

Appellant and Range then entered the room. According to Ontiveros, Sample immediately ran towards them. In statements to police, prosecutors, and in some pre-trial hearings, Ontiveros testified that: both Appellant and Range got into an altercation with

Sample wherein Sample was badly beaten; Appellant helped subdue Sample while Range got Sample into a chokehold, rendered him unconscious, zip-tied his hands and feet, and pushed him face down into the bed; and then, after Sample was zip-tied, Appellant and Range began rummaging through Sample's belongings looking for things to steal.[7] Yet, in another pre-trial hearing, Ontiveros testified that Appellant was never in the room.

Contrary to all of her pre-trial testimony, Ontiveros testified at trial that Appellant was inside the room but only Range tackled Sample, put him in a chokehold, fought him over to the bed, and zip-tied his hands and feet together. During this time, according to Ontiveros' trial testimony, Appellant was "just standing there" trying to calm her down because she was afraid and "freaking out." Ontiveros was impeached at trial with her prior statements and testified at trial that she lied in the prior statements and that her trial testimony was truthful.

Following the beating and robbery of Sample, Appellant and Range left the hotel room first. Appellant instructed Ontiveros to wait a few minutes before leaving. Upon leaving Sample's hotel room, the phones were unplugged, a "do not disturb" sign was placed on the door, and the TV volume was turned up to its maximum setting.[8] Sample remained unconscious and face down on the bed in a pool of his own blood with his hands and feet zip-tied behind his back.

---

[7] They were ultimately unsuccessful in opening the closet safe, but they did steal Sample's watch and phone.

[8] According to the housekeeper who later discovered Sample's body, the door to Sample's room had been left ajar.

Upon exiting the hotel, Appellant, Range, Ontiveros, and Burden got into a vehicle parked just outside the hotel. Ontiveros and Burden testified that they had never previously met Range before the day of the robbery and had never seen this vehicle before. They then drove down the road to where Appellant's car was parked.[9] From there, Appellant, Ontiveros, and Burden drove in Appellant's car back to the loft shared by Appellant and Ontiveros. Burden testified that Appellant had blood on his face. She believed the blood was Sample's because neither Appellant nor Range was injured. Upon returning to the loft, Appellant ordered Burden and Ontiveros to go upstairs while he and Range spoke downstairs. Burden overheard Appellant and Range questioning whether Sample's watch was valuable and discussing what to do with it.

A few hours later, hotel housekeeping discovered Sample's body, and hotel management called the police. First responders arrived on the scene and found Sample already deceased. Law enforcement then launched a homicide investigation.

Officer DeHoyos, the first officer to respond to the scene, testified that there was evidence of an altercation, including papers scattered across the room and a lot of blood. Detective Chaney, the lead detective assigned to the investigation, testified that, based on the blood spatter, he believed Sample had been hit with an object. The medical examiner, Dr. Beth Frost, testified that she performed an autopsy on Sample and determined his cause of death to be homicidal violence, including asphyxia and blunt force trauma. Sample had cuts and bruises all over his face and a large gash inside his mouth. A bone in his skull was

---

[9] Ontiveros testified that the car, a Dodge Challenger, belonged to both her and Appellant. But she was never able to drive the car because it was a stick shift and only Appellant could drive it.

chipped and he had hemorrhages inside his eyelids and along his neck and chest, all consistent with blunt force trauma. She also testified that the bruises on his neck, chest, and eyes were consistent with asphyxiation.

At trial, the jury was presented with surveillance videos obtained from the hotel which showed Appellant and Range entering the hotel and exiting approximately seventeen minutes later. The videos also revealed Appellant throwing a cell phone into a sewer near the hotel. Law enforcement later recovered the cell phone and determined that it was Sample's.

Through the investigation of Sample's murder, law enforcement tracked down and arrested Appellant, Burden, and Ontiveros in Las Vegas.[10] They, along with Range, were indicted for capital murder in the course of robbery.[11] At Appellant's jury trial, after the close of evidence, Appellant requested a lesser-included-offense instruction on robbery. The basis for Appellant's request was Burden's trial testimony that "[t]he intention was just to go up there and get money. It was never for anybody to get hurt." The trial court

---

[10] Shortly after Sample's murder, Appellant sent Burden on a bus to Louisville, Kentucky, to get a new identification card which would allow her to fly to Las Vegas. Burden testified that Appellant arranged for and bought her bus and plane tickets and she did as he instructed. Meanwhile, Ontiveros underwent breast augmentation surgery and had planned to recover at home, but Appellant instructed her to join him in Las Vegas. When arrested and questioned by law enforcement in Las Vegas, Ontiveros volunteered information that Sample's watch could be found in Appellant's closet in his Dallas loft. However, no watch was ever recovered.

[11] The indictment in Appellant's case alleged that he "intentionally cause[d] the death of [Sample] . . . by striking the complainant with a hand and kicking the complainant and suffocating with a pillow and squeezing complainant's neck with a hand and arm, and the defendant was then and there in the course of committing and attempting to commit the offense of robbery of said deceased."

denied Appellant's requested instruction and instead instructed the jury on capital murder and the lesser-included offenses of murder and manslaughter. The jury charge also instructed the jury that it could find Appellant guilty of capital murder as the principal actor, as a party to the offense, or under a conspiracy theory of liability. The jury returned a general guilty verdict for capital murder, and Appellant was automatically sentenced to life in prison without the possibility of parole.

## II.    Court of Appeals' Opinion

On appeal, Appellant argued, among other things,[12] that the trial court erred by denying his request for a lesser-included-offense instruction on robbery. In support of his position, Appellant pointed to two co-conspirator statements: (1) Ontiveros' testimony that Appellant was "just standing there" during the altercation between Range and Sample; and (2) Burden's statement that that the plan was just to rob Sample and no one was supposed to get hurt.

The court of appeals rejected Appellant's argument, concluding that there was no evidence that would permit the jury to rationally find that Appellant was guilty only of robbery. *George*, 2019 WL 5781917, at *6.  The court reasoned that because the jury was permitted to consider a conspiracy theory of liability for murder committed in the course of a robbery, for Appellant to be entitled to the robbery instruction, there must have been

---

[12] In addition to challenging the trial court's denial of his requested instruction on robbery, Appellant argued that the evidence was insufficient to sustain his conviction and that the trial court abused its discretion by denying his motion for a new trial and overruling his objection to the State's closing argument. *George v. State*, No. 05-18-00941-CR, 2019 WL 5781917 (Tex. App.— Dallas Nov. 6, 2019).

some evidence that: (1) there was no murder; (2) the murder was not committed in furtherance of the conspiracy; or (3) the murder should not have been anticipated. *Id*. (citing *Solomon v. State,* 49 S.W.3d 356, 369 (Tex. Crim. App. 2001)). Because Appellant did not challenge the first two possibilities, the court focused solely on the third—that the murder should not have been anticipated. *Id.* In rejecting Appellant's contention that the co-conspirators' statements constituted some evidence that the murder should not have been anticipated, the court reasoned: "Whether appellant or a co-conspirator intended to kill decedent before the robbery took place is irrelevant if the relevant liability elements were established at the time the crime was committed." *Id*. (citing *Solomon*, 49 S.W.3d at 369). The court held there was "no evidence that [Sample's] death . . . was not anticipated or that it should not have been anticipated." *Id.* Further, appearing to create a bright-line rule, the court continued: "To the contrary, when one decides to steal property from another, he should anticipate he or his co-conspirator might be confronted by that individual and that his co-conspirator might react violently to that confrontation." *Id.* Accordingly, the court upheld the trial court's denial of the instruction.

We granted Appellant's petition for discretionary review on a single ground to evaluate the court of appeals' analysis of this issue.

### III.    Analysis

In his petition for discretionary review, Appellant contends that the court of appeals' adoption of a bright-line rule—that one should always anticipate that his co-conspirator might commit murder during the course of any robbery or theft—was erroneous because determining whether Appellant was entitled to a lesser-included-offense instruction on

robbery required a consideration of the particular facts presented. He further contends that there was more than a scintilla of evidence presented at his trial to support his claim that he was entitled to the robbery instruction. We agree with Appellant as to the first point but not as to the second. While the court of appeals was incorrect to suggest that a categorical rule is appropriate in this context, looking to the totality of the record here, we agree with the court's ultimate conclusion that no evidence rationally refutes or negates the evidence showing that Appellant should have anticipated the murder. Therefore, robbery was not a valid, rational alternative to the charged offense. We explain these conclusions in turn below.

### A.    Applicable Law

In determining whether a defendant is entitled to a lesser-included-offense instruction, we engage in a two-step analysis. First, we must determine "whether the offense contained in the requested instruction is a lesser-included offense of the charged offense." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). This is a question of law that does not depend on what evidence will be produced at trial. *Safian v. State*, 543 S.W.3d 216, 220 (Tex. Crim. App. 2018). It is uncontested that robbery is a lesser-included offense of the charged offense here. Thus, we focus our analysis on the second step, which requires us to determine whether the evidence admitted at trial "would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense." *Solomon*, 49 S.W.3d at 369. "'Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge.'" *Goad*, 354 S.W.3d at 446 (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). We review all the evidence presented at trial,

not just the evidence presented by the defendant. *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016) ("The entire record is considered"; a single statement "cannot be plucked out of the record and examined in a vacuum."). "[I]f some evidence from any source raises a fact issue on whether [the defendant] is guilty of only the lesser [offense]," the defendant is entitled to the instruction "regardless of whether the evidence is weak, impeached, or contradicted." *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012). However, we will not hold that the evidence entitles a defendant to a lesser-included-offense instruction if the record would support only an illogical or irrational finding by the jury that the defendant is guilty only of the lesser offense; rather, the ultimate inquiry is whether the lesser offense is a valid, *rational* alternative to the charged offense. *Sweed v. State,* 351 S.W.3d 63, 68 (Tex. Crim. App. 2011).

In this case, Appellant was charged with capital murder for intentionally causing Sample's death in the course of committing or attempting to commit a robbery. *See* TEX. PENAL CODE §§ 19.03(a)(2) (stating a person commits capital murder if he commits murder as defined under Section 19.02(b)(1), and "intentionally commits the murder in the course of committing" robbery); 19.02(b)(1) (defining offense of murder for intentionally or knowingly causing the death of an individual). The jury instructions permitted Appellant's conviction under any of three possible theories: as a principal actor, as a party, or under a conspiracy theory. *See id.* § 7.02(a)(2), (b). Appellant's current arguments, however, pertain only to the third possibility, that of conspirator liability, because it is only under this theory that it would have been logically possible for the jury to find him guilty only of robbery based on the testimony of his co-conspirators. As such, we consider only that

theory going forward.[13]

The relevant language in Penal Code Section 7.02(b) governing conspirator liability is as follows:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE § 7.02(b). Thus, to find Appellant guilty of capital murder under a conspirator theory of liability, the jury must have found that, in attempting to carry out a conspiracy to rob Sample: (1) a co-conspirator (presumably Range) murdered Sample; (2) Sample's murder was committed in furtherance of the robbery; and (3) Sample's murder should have been anticipated as a result of the carrying out of the conspiracy. *Id.*

Assuming the jury convicted under this theory, Appellant was entitled to a lesser-included-offense instruction on robbery only if the evidence supported that he was guilty only of robbery and was not guilty of capital murder. *Solomon*, 49 S.W.3d at 369. Therefore, there had to be "'some evidence directly germane to [the] lesser-included offense for the factfinder to consider[.]'" *Id.* (quoting *Skinner v. State*, 956 S.W.2d 532,

---

[13] Had the jury believed Appellant was a principal actor, then it clearly could not have found that he was guilty only of robbery because he would have intentionally caused Sample's death. *See* TEX. PENAL CODE § 19.03(a)(2). And if the jury believed Appellant was a party to capital murder under Penal Code Section 7.02(a)(2), then, similarly, the jury could not have rationally relied on Ontiveros' and Burden's testimony to find that Appellant was guilty only of robbery because he would have "act[ed] with intent to promote or assist" in Sample's murder and "solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid" Range in committing the murder. *Id.* § 7.02(a)(2). Thus, it is only under the possibility of conspirator liability that Appellant could theoretically have been found guilty only of robbery based on Ontiveros' and Burden's testimony. Therefore, we consider only that possibility in our analysis.

543 (Tex. Crim. App. 1997); *see also Sweed,* 351 S.W.3d at 68 (stating that lesser-included-offense standard may be satisfied "if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations"). For these purposes, any such evidence directly germane to robbery had to refute or negate at least one of the three conspiracy-theory elements under Penal Code Section 7.02(b) needed to establish Appellant's liability for capital murder. *See* TEX. PENAL CODE § 7.02(b); *Solomon*, 49 S.W.3d at 369; *Sweed*, 351 S.W.3d at 68.

In this case, it is undisputed that Sample was murdered and that such murder was committed in furtherance of the conspiracy to commit robbery. Thus, Appellant's sole contention is that there was some evidence that refutes the proof that he should have anticipated Sample's murder, such that the jury could have rationally found him guilty only of robbery.

### B. Whether a lesser-included-offense instruction is appropriate here requires a fact-specific inquiry.

In evaluating the court of appeals' treatment of this question, we conclude as an initial matter that the court erred by suggesting that a participant in a conspiracy to steal property should *always* anticipate that a murder might occur, such that a lesser-included-offense instruction on robbery is *never* warranted. *See George*, 2019 WL 5781917, at *6 (reasoning that "when one decides to steal property from another, he should anticipate he or his co-conspirator might be confronted by that individual and that his co-conspirator might react violently to that confrontation"). The second step of the inquiry as to whether a defendant is entitled to a lesser-included-offense instruction "requires examining all

the evidence admitted at trial," such that "[t]he entire record is considered." *Bullock*, 509 S.W.3d at 925; *see also Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005) (stating that the second step requires a court to "evaluate[] the evidence in the context of the entire record"). Thus, the very nature of the inquiry—asking whether there is some evidence *in this case* that is specifically germane to the lesser offense such that the jury could rationally find the defendant guilty only of that lesser offense—necessitates a case-specific analysis. As such, the suggested bright-line rule cannot apply in this context. Therefore, an examination of the particular facts in the record is required. We turn to that analysis below.

### C.     The evidence does not support a lesser-included-offense instruction on robbery.

Appellant's argument is that the testimony from Burden and Ontiveros shows that he never intended or planned for Sample to get hurt; rather, his only intention was to rob Sample. This evidence, however, fails to rationally refute the evidence which establishes that Appellant should have (and, in fact, likely did) anticipate Sample's murder. *See Solomon*, 49 S.W.3d at 369 (concluding that a lesser-included-offense instruction on robbery was inappropriate where "there is no evidence that the victim's death was not anticipated, much less any evidence that the death should not have been anticipated."). Penal Code "Section 7.02(b) does not require . . . [that Appellant] actually anticipated [the murder]," only that under the "totality of the circumstances . . . on the facts of each case" it was "'reasonably foreseeable' within the scope of the [conspiracy]." *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013). Further, as we noted in *Solomon*, it matters

not whether a defendant anticipated murder in advance as part of the planning of the conspiracy. Rather, the relevant inquiry is whether, at any point before or during the acts to carry out the conspiracy, the defendant should have anticipated the murder. *Solomon*, 49 S.W.3d at 369 (stating under analogous facts that "whether [the defendant] intended to kill the victim before the robbery took place is irrelevant if the relevant liability elements were established at the time the crime was committed").

In *Solomon*, we held that the defendant was not entitled to an instruction on robbery as a lesser-included offense of capital murder under a conspiracy theory because, even though no evidence suggested there was a plan to kill the victim ahead of time, during the robbery Solomon told one of his co-defendants to shoot the victim knowing that his co-defendant had a gun. *Id.*[14] Thus, it was irrelevant that the initial plan did not include killing the victim because the circumstances at the time of the robbery clearly showed that the victim's death should have been anticipated (and in fact was anticipated by Solomon), and

---

[14] In *Solomon*, the defendant had conspired with others to rob a victim who was having car trouble on the side of the road. 49 S.W.3d at 360. Upon pulling his car over, Solomon initially acted as if he was going to help the victim by giving the victim a jump to get his car started. *Id*. But when Solomon returned to his car and spoke to his co-defendant, he suggested that they "jack" the victim. *Id*. Solomon then watched as the co-defendant removed a gun from the car's glove box and agreed to rob the victim. *Id*. Solomon also told his co-defendant to shoot and kill the victim because "that's how I got caught the last time." *Id*. The co-defendant proceeded to rob and shoot the victim, killing him. After Solomon was charged with and convicted of capital murder under a conspiracy theory of liability, we held that he was not entitled to a lesser-included-offense instruction on robbery. *Id*. at 369. Although one of Solomon's accomplices had testified that Solomon initially intended only to rob the victim, we held this fact was not dispositive because "whether appellant intended to kill the victim before the robbery took place is irrelevant if the relevant liability elements were established at the time the crime was committed." *Id*. Further, because Solomon told his co-defendant to shoot and kill the victim immediately before the robbery, there was "no evidence that the victim's death was not anticipated, much less any evidence that the death should not have been anticipated." *Id*.

there was no evidence to the contrary. *Id.* Here, similarly, an examination of the evidence surrounding the commission of the robbery demonstrates that Appellant should have anticipated Sample's murder. Burden's and Ontiveros's testimony does nothing to refute that evidence.

> **1. Appellant cannot rely on Burden's testimony because her statement provides no evidence as to whether Appellant should have anticipated Sample's murder.**

Appellant points to Burden's testimony that the intention was only to rob Sample and not to hurt him as some evidence that he should not have anticipated Sample's murder. This testimony, however, was given during defense counsel's questioning of Burden about *her* participation in the planning of the robbery.[15] Burden did not represent that she had any personal knowledge of Appellant's intentions towards Sample. Based on this context, Burden's statement was not evidence upon which a rational jury could rely to conclude that

---

[15] Specifically, the following exchange occurred:

Q: And you are telling this jury today under oath that you didn't set this up?
A: Not saying that I didn't set it up—
Q: Well, that's what I'm asking—
A: —I had a part in it.
Q: Did you set it up?
A: Did I set it up? No. Did I have a part in it? Yes.
Q: Okay. What was your part in it?
A: I informed him [Appellant] of things—where things were in the room. What—what the man was like. What room number he was in. I informed him of that—
Q: Well, why [are] you doing it? Why [are] you doing it?
A: I don't know.
Q: Yes, you do. Why [are] you doing it?
A: The intention was just to go up there and get money. It was never for anybody to get hurt.

9 RR 164-65.

Appellant (as opposed to Burden) never had any intention that Sample would be harmed. Likewise, we should not rely on this statement, taken out of context by Appellant, as evidence of Appellant's plans or intentions. *See Bullock*, 509 S.W.3d at 925 (stating that a reviewing court may not "pluck" a single part of the testimony from the record and view it in isolation; rather, we are required to view such testimony in context). Further, even assuming that the jury could have interpreted Burden's testimony in the manner Appellant suggests, her testimony still fails to constitute some evidence that Appellant should not have anticipated the murder, such that the jury could rationally find him guilty only of robbery on this basis. Burden's testimony speaks only to what was intended at the time the robbery plan was formulated. It does not address whether Appellant, during the course of the robbery, should have anticipated Sample's murder given the circumstances that unfolded in the hotel room. *See Solomon*, 49 S.W.3d at 369.

> **2. Appellant cannot rely on Ontiveros's testimony because the fact that he did not participate in the beating is not directly germane to whether he *should have* anticipated the murder.**

Similarly, we reject Appellant's contention that Ontiveros's testimony indicating he was "just standing there" during the beating of Sample constitutes some evidence that he should not have anticipated the murder, such that he was entitled to the instruction on robbery here. At best, this testimony shows that Appellant did not personally intend to harm Sample, but that fact says nothing about the reasonable foreseeability of Range's murder of Sample. *See Anderson*, 416 S.W.3d at 889. Thus, because Ontiveros' testimony describing Appellant's non-participation in the offense is not directly germane to the question of whether Sample's murder should have been anticipated within the scope of the

agreement to commit robbery, it cannot provide a rational basis for finding that Appellant was guilty only of robbery.

> **3.** **A review of the totality of the circumstances demonstrates that Appellant should have anticipated Sample's murder, and no evidence rationally supports the opposite conclusion.**

The following facts in the record support that Sample's murder was reasonably foreseeable within the scope of the unlawful agreement to commit robbery:

After Burden shared the information about Sample's cash, Appellant masterminded the plan to rob Sample in his hotel room—a confined and private space in which there would likely be an altercation. Given the proximity of other guests in nearby rooms, it would be logical for Appellant to anticipate that Sample would have to be silenced by force to avoid being caught. Appellant also knew that Sample was high on drugs and that his behavior had become erratic and paranoid. Anticipating that Sample might become violent, Burden warned Appellant that he needed to be careful and advised him to take the phone cords from the hotel room so that Sample could not call for help. Before executing the "job," Appellant changed into all black clothing and shoes and wore gloves. He brought Range, a large man, with him to help effectuate the robbery. Range and Appellant drove separately to the hotel, with Range parking close to the hotel and Appellant parking his vehicle off the hotel's property. Previously when dropping off or picking up Ontiveros and Burden, Appellant parked right outside the hotel. Range brought zip ties with him for the purpose of restraining Sample.[16] When entering the elevator to go up to Sample's room,

---

[16] Investigators also found a roll of duct tape near Sample's body, but there was no evidence of its

Appellant used his elbow to press the floor number. These facts collectively indicate that Appellant was the boss, Range was the "muscle" who could ensure Sample's "cooperation," and Appellant thought the plan through and wanted to avoid leaving evidence at the crime scene.

Once in Sample's hotel room, there were three people (Appellant, Range, and Ontiveros) against one. Even assuming that the jury believed Ontiveros' testimony that Appellant "just stood there" during the beating, the fact that Appellant calmly said and did nothing while Range viciously beat Sample unconscious, bound him with zip ties, and left him face down on the bed in a pool of his own blood suggests that Appellant was not surprised by, and likely approved of, Range's actions. Then, after subduing Sample, Appellant and Range "tossed" the room and tried unsuccessfully to get into the safe, all while Sample remained bound and unconscious in the bed. Before leaving the room nearly seventeen minutes after they had arrived, Appellant placed a "do not disturb" sign on the hotel room door, turned the TV to the maximum volume, and unplugged the phone to delay any detection of the crime. He then left with Sample's watch and phone. Appellant never tried to help Sample, nor did he call for help. Instead, he discarded Sample's phone in a sewer drain outside the hotel, kept Sample's watch, and ultimately fled with Burden and Ontiveros to Las Vegas.

Given the totality of the circumstances, it is clear that Appellant should have anticipated (and likely did anticipate) Sample's murder. The nature of the offense here was

---

use during the robbery, nor was there evidence that Range or Appellant brought it with them.

an inherently violent one, such that Range's savage beating of Sample was reasonably foreseeable within the scope of the agreement to commit robbery. Neither Ontiveros' testimony describing Appellant's non-participation in the beating nor Burden's testimony indicating the plan was not to harm Sample refutes this conclusion. Therefore, Appellant has failed to point to any evidence in the record that could rationally establish that if he was guilty, he was guilty only of robbery. The trial court was correct in refusing to include in the jury charge the requested lesser-included-offense instruction.

## IV.    Conclusion

Although the court of appeals erred by suggesting that in the case of every robbery or theft, a defendant should always anticipate a death such that a lesser-included-offense instruction on robbery in such situations is foreclosed, we nevertheless agree that Appellant was not entitled to the instruction under the particular facts presented here. Because the victim's murder should have been anticipated under the totality of the circumstances surrounding the conspiracy to commit robbery, and no evidence supported the opposite conclusion, robbery was not a valid, rational alternative to the charged capital murder. Therefore, we affirm the judgment of the court of appeals.

DELIVERED: November 24, 2021
PUBLISH